**UNITED STATES of America,**
**Appellee,**

v.

**Angelo BERTOLOTTI et al.,**
**Defendants-Appellants.**

Nos. 1196, 1224, 1230, 1231, 1233, 1234 and 1261, Dockets 75–1107, 75–1134, 75–1137, 75–1140, 75–1144, 75–1165, 75–1169.

United States Court of Appeals, Second Circuit.

Argued July 14, 1975.

Decided Nov. 10, 1975.

150

Sanford Katz, New York City, for appellant Bertolotti.

Gilbert Epstein, New York City, for appellant Capotorto.

J. Jeffrey Weisenfeld, New York City (Goldberger, Feldman & Breitbart, New York City), for appellant Camperlingo.

William S. Isenberg, North Miami, Fla. (Law Offices of Peter F. K. Baraban, North Miami, Fla.), for appellant Thompson.

Irving Anolik, New York City, for appellant DeLuca.

Murray Richman, New York City, for appellant Angley.

Gerald B. Lefcourt, New York City, for appellant Guerra.

Paul J. Curran, U. S. Atty., S. D. N. Y. (John D. Gordan, III, James P. Lavin, T. Gorman Reilly, John C. Sabetta, Steven M. Schatz, Asst. U. S. Attys., of counsel), for appellee.

Before MOORE, FRIENDLY and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Appellants Angelo Bertolotti, James Capotorto, Joseph Camperlingo, Raymond Thompson, Joseph DeLuca, James Angley and Louis Guerra, convicted of conspiracy to violate the federal narcotics laws (21 U.S.C. § 846) following a four-week jury trial in the District Court for the Southern District of New York, seek reversal of these convictions. Because of the Government's failure to heed our admonition in *United States v. Sperling,* 506 F.2d 1323 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), that it cease combining in an alleged single conspiracy, criminal acts loosely, if at all, connected,[1] we are compelled to accede to appellants' request.

## I. THE FACTS

Indictment 75 Cr. 5, filed January 6, 1975, which superseded Indictment 74 Cr. 620, filed June 18, 1974, charged twenty-nine individuals, including the seven appellants, with an assortment of federal narcotics violations. The Government supplemented the indictment with lists, copies of which were given to defense counsel, containing the names of thirty-one additional unindicted co-conspirators.

Count One charged all twenty-nine of the indicted individuals with conspiracy to distribute and possess with intent to distribute Schedule I and II narcotic drugs. Thirteen overt acts in furtherance of this conspiracy were alleged. Each of the appellants was named in at least one of these overt acts.

Counts Two through Nine charged many, although not all, of the defendants with substantive narcotics possession and distribution violations. Appellant DeLuca was charged in Count Two with distribution and possession of twelve kilograms of cocaine. Appellant Guerra was charged in Count Four with distribution and possession of one kilogram of cocaine. The remaining five appellants were not named in any of the substantive counts.

Six defendants, including the central figures in the alleged conspiracy, Albert Rossi and Ernest Coralluzzo, entered guilty pleas prior to trial. Six other defendants were "unavailable" for trial. The remaining seventeen proceeded to trial before Judge Robert Carter and a jury. The results were disastrous to the Government. Not a single defendant was convicted on any of the eight substantive counts.[2] On Count One, the

---

1. In *Sperling,* Judge Timbers issued forth a clear warning to the United States Attorney's office:

   In view of the frequency with which the single conspiracy vs. multiple conspiracies claim is being raised on appeals before this court, [citations omitted] we take this occasion to caution the government with respect to future prosecutions that it may be unnecessarily exposing itself to reversal by continuing the indictment format reflected in this case. . . . [I]t has become all too common for the government to bring indictments against a dozen or more defendants and endeavor to force as many of them as possible to trial in the same proceeding on the claim of a single conspiracy when the criminal acts could be more reasonably regarded as two or more conspiracies, perhaps with a link at the top. 506 F.2d at 1340–41.

2. Appellant DeLuca was acquitted under Count Two and Appellant Guerra was acquitted under Count Four.

conspiracy count, the jury acquitted eight defendants and failed to agree on two others. Only the seven appellants were found guilty on this count.

Because of the large number of trans-actions alleged by the Government to be part of a single conspiracy, it is difficult to succinctly summarize the facts. We begin, however, by describing in chronological order the four major events about which evidence was produced at trial, leaving for later the question of how, if at all, they may be tied together.

### A) *The Matthews-Harrison Rip-off (Spring 1973)*

As is true of each of the four major deals hereinafter described, Albert Rossi and Ernest Coralluzzo were the principal participants in this transaction. In the spring of 1973, these two and James Capotorto negotiated with Frank Matthews and Harold Harrison for the sale to them of thirty to fifty kilograms of heroin. After Matthews and Harrison had paid $375,000 of the agreed price, Rossi and Coralluzzo, exhibiting a disrespect for the rules of fair play extreme even among narcotics kingpins, decided to renege on their part of the deal.[3] Matthews and Harrison, understandably annoyed by such lack of cooperation, decided that self-help would be the most appropriate remedy under the circumstances. Unfortunately for Mr. Capotorto, he turned out to be the object to which Harrison and Matthews helped themselves. Rossi and Coralluzzo, in their only display of humanity revealed by the evidence at trial, returned the $375,000 in exchange for the release of their grateful companion.

### B) *The Florida Quartet's Two Kilogram Purchase (May 1973 to September 1973)*

In late May or early June 1973, Rossi and Coralluzzo met in New York with two Florida visitors, the previously mentioned Capotorto and one Raymond Thompson. Capotorto, speaking for himself and Thompson, as well as two other Florida associates not present at the gathering, Angelo Bertolotti and Joseph Camperlingo, indicated the quartet's desire to purchase one kilogram of cocaine. Upon Capotorto's representation that his group had raised between $17,000 and $19,000 to pay for these narcotics, Rossi telephoned Louis Guerra requesting the delivery of one kilo. The following day, Guerra arrived bearing, not one but two kilos of cocaine, one pure and one diluted.[4] With a little persuasion from Rossi, Capotorto and Thompson agreed to double their purchase. The $17,000 (or $19,-000) was immediately paid to Rossi and Coralluzzo for the pure kilogram, and additional payments for the diluted kilogram were promised.

Later in June, Rossi and Coralluzzo went to Florida to collect the balance owed them on the second kilo. At a meeting with Capotorto and Thompson, an additional partial payment of $5,000 was made.

In July, Rossi and Coralluzzo met with all four members of the Florida quartet to discuss the remaining balance. Although there was some dispute about the quality of the second kilo, it was finally agreed that if Bertolotti, Thompson and Camperlingo could supply Rossi and Coralluzzo with five or six hundred pounds of marijuana, it would be credited against the money owed on the cocaine. In August, the quartet met with Rossi to iron out the details of the marijuana

**3.** At trial, the Government introduced evidence of prior similar conduct by Rossi. In March 1973, he had agreed to sell two kilograms of cocaine to co-conspirator Greg Samuels. Although Rossi received and retained $36,000 from Samuels in payment therefor, the narcotics were never delivered. Even earlier, in February 1973, Rossi had robbed a doctor of 600 pounds of manita, a narcotic cutting agent,

after negotiations for its purchase had stalemated. Both these episodes were alleged to be part of the single conspiracy charged in the indictment.

**4.** Although this was the substance of Albert Rossi's testimony, the jury's acquittal of Guerra on charges of possessing and distributing the two kilos (Count Four) indicates that they may have rejected this portion of the proof.

deal. Shortly thereafter, Bertolotti, Thompson and Camperlingo delivered six hundred pounds of marijuana to Rossi in Florida, and he and Capotorto drove it to New York in a camper. In New York, one hundred pounds were given to Guerra, and except for one hundred twenty-five pounds which were returned to Camperlingo, the remainder was sold.

C) *The Lucas Rip-off (September 1973)*

In late August or early September 1973, Rossi, through a middleman Peter Mengrone, arranged for a heroin sale to one Frank Lucas. Lucas gave Rossi a partial payment of approximately $30,-000; in return, Rossi was to provide a large quantity of heroin. Following discussions with Capotorto, Guerra, Louis Lepore, Robert Browning and Gary Pearson, Rossi concluded that Lucas would be an easier bird to pluck than Matthews and Harrison had been. Accordingly, he again decided to keep the money without producing the drugs. Out of the $30,000, Rossi gave Capotorto $3,000 to $4,000 and used $8,000 to finance a trip to Florida to conduct the transaction with Franklin Flynn described hereinafter.

From August to October 1973, the Westchester District Attorney's office maintained an authorized wiretap on Peter Mengrone's home telephone. Tapes of fifty-five intercepted calls relating to the Lucas rip-off and involving such participants as Rossi, Coralluzzo, Guerra, Capotorto and Pearson were played to the jury.

D) *The Flynn Rip-off (July 1973 to December 1973)*

This transaction was clearly the core of the Government's conspiracy theory around which all the other deals revolved. It began in July 1973 with a Florida meeting between Rossi and one Angelo Iacano, during which the latter stated that his partner, Franklin Flynn, had access to a large cocaine supply in South America. Pursuant to arrangements made at that time, a second meeting took place later in the month. In addition to Rossi and Iacano, this gathering was attended by Capotorto, Flynn and another of Iacano's partners, Roger Silverio. The meeting resulted in an offer by Rossi to purchase "all the cocaine" that Flynn could supply.

In August, Rossi, Capotorto and Charles Guida met with Iacano in New York to sample the latter's wares. Rossi, satisfied with the quality of the cocaine tested, agreed to purchase twelve kilos.

In September, Rossi received a telephone call from Flynn who advised him that the cocaine shipment had arrived and was available for pickup in Florida. Rossi and Coralluzzo thereupon conceived a scheme to drastically reduce their overhead on this transaction. In a slightly altered version of the Matthews-Harrison and Lucas scenarios in which money was acquired without a delivery of narcotics, Rossi and Coralluzzo now planned to acquire the Flynn narcotics without a delivery of money. In furtherance of this plan Rossi, using the money acquired from Lucas, flew down to Florida taking with him Coralluzzo, Pearson, Browning, Lepore, Joseph DeLuca and James Angley.[5] Upon his arrival in Florida, Rossi contacted Flynn who agreed to deliver the cocaine to the Diplomat Hotel. When Flynn, Iacano and Silverio arrived with the twelve kilos, they found a most hostile reception committee. Rossi and Coralluzzo, with guns drawn, appropriated the narcotics while Browning and DeLuca bound Flynn and his associates.

The acquisition portion of the venture successfully completed, the group returned to New York City where DeLuca, Angley, Pearson, Lepore and Browning were paid by Rossi and Coralluzzo for their assistance in the theft.[6]

---

5. Angley was forced to return to New York on personal business almost immediately and did not participate in the "rip-off."

6. DeLuca received $3,000 in cash and cocaine valued at $2,000. Angley received three or four ounces of cocaine.

The distribution operation which followed was described by Rossi in great detail at trial. Since many of the alleged participants in this part of the conspiracy were acquitted, it would serve no purpose to reproduce the distribution scheme here in its entirety. It must be mentioned, however, that appellants De-Luca, Angley and Guerra played major roles therein. On three occasions, DeLuca delivered large quantities of cocaine to potential buyers for Rossi. Angley's part in the distribution operation was even larger. In October 1973, when Rossi and Coralluzzo were forced to become fugitives, Angley took over a large portion of their narcotics activities, making several sales and delivering the proceeds to the fugitives. Guerra's role was more that of an independent contractor than a delivery boy. In October, he purchased one kilo of the Flynn cocaine from Rossi and Coralluzzo and distributed it on his own.[7]

## II. SINGLE CONSPIRACY

■ When convictions have been obtained on the theory that all defendants were members of a single conspiracy although, in fact, the proof disclosed multiple conspiracies, the error of variance has been committed. *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See* Note, *Federal Treatment of Multiple Conspiracies,* 57 Colum.L.Rev. 387, 396 (1957). Appellants contend that, while the indictment alleged a single conspiracy, the proof in this case showed multiple conspiracies. Their assertions as to the number actually proved range from two to seven. The Government, on the other hand, steadfastly maintains that there existed but · one overall conspiracy consisting of suppliers, middlemen and customers whose common purpose was the distribution of

large amounts of narcotics into the hands of the ultimate purchasers. *United States v. Agueci,* 310 F.2d 817, 826 (2d Cir. 1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Under the Government's theory presented at trial, and adhered to on appeal, Guerra and Flynn were the suppliers, Rossi and Coralluzzo the major middlemen and DeLuca, Angley, Guida, Browning, L. Lepore, Manero, Capotorto, Camperlingo, Bertolotti, Thompson and Guerra their customers.[8] The Government contends that each of the actors knew he was a participant in a large scale ·scheme designed to place narcotics in the hands of their ultimate users. We cannot agree.

This Circuit has gone quite far in finding single conspiracies in narcotics cases. *See United States v. Tramunti,* 513 F.2d 1087 (2d Cir. 1975), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Sperling, supra; United States v. Mallah,* 503 F.2d 971 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. Bynum,* 485 F.2d 490 (2d Cir. 1973), *vacated and remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); *United States v. Agueci, supra.* Despite the existence of multiple groups within an alleged conspiracy, we have considered them as part of one integrated loose-knit combination in instances where there existed "mutual dependence and assistance" among the spheres, *United States v. Tramunti, supra,* a common aim or purpose among the participants, *United States v. Agueci, supra,* or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture, *United States v. Sperling, supra; United States v. Bynum, supra.* The common thread running through these cases is

---

7. In addition to the four major deals outlined herein, evidence was produced at trial regarding several collateral transactions engaged in by appellants including (1) six cocaine transactions between appellant Angley and John Serrano, and (2) various heroin and cocaine trans-

actions between appellant Guerra and Pearson.

8. Guerra served a dual role under the Government's theory, acting as both supplier and customer.

our treatment of them as general, albeit illegal, business ventures. *United States v. Mallah, supra,* at 976. Each involved traditional *modus operandi* with middle-men purchasing narcotics for sale to a series of customers. *See United States v. Agueci, supra.*

Of the four major transactions proved at trial, only the one involving the "Florida quartet" resembled the orthodox business operation we have found to exist in narcotics conspiracies. The Matthews-Harrison and Lucas matters, indeed, could hardly be classified as narcotics transactions, for no drugs changed hands. In truth, they were little more than simple cash thefts. The Flynn rip-off likewise cannot be described as a traditional dealing in narcotics. Given such unorthodox and diverse transactions, we are reluctant to ascribe knowledge of the heavy-handed Rossi-Coralluzzo operations to participants in any single transaction.

█ Our examination of the evidence reveals a sufficient basis for the jury to be satisfied beyond a reasonable doubt that each of the asserted transactions took place, but no evidence linking them together in a single overall conspiracy. *United States v. Miley,* 513 F.2d 1191, 1206 (2d Cir. 1975); *United States v. Butler,* 494 F.2d 1246, 1255 (10th Cir. 1974). Indeed, the only common factor linking the transactions was the presence of Rossi and Coralluzzo. This type of a nexus has never been held to be sufficient. *Kotteakos v. United States, supra,* 328 U.S. at 773–74, 66 S.Ct. 1239. We find our description of the operation in *Miley* perfectly apt in the instant case. The operations centering around Rossi and Coralluzzo could hardly be attributed to any real organization, even a "loose-knit" one. *United States v. Miley, supra,* at 1207. There was no evidence to show that these two "were conducting what could seriously be called 'a regular business on a steady basis.'" *Id.* The

scope of the operation was defined only by Rossi's resourcefulness in devising new methods to make money. *Id.*

It is clear to us that the Government has merely merged several conspiracies for the sake of convenience. *United States v. Butler, supra,* at 1256. Most convincing in this regard is the internal memorandum of Special Agent James Harris (Drug Enforcement Administration), turned over to defendants as 3500 material,[9] and introduced by them in support of their various severance motions. This memorandum, prepared on June 21, 1974, three days after the filing of the original indictment (74 Cr. 620), identifies the Flynn rip-off as the subject of that indictment and labels it "Conspiracy # 1." It then proceeds to describe three cocaine transactions involving Louis Guerra including the two kilo Florida deal and the rip-off of Gregory Samuels. These are described by Agent Harris as comprising "Conspiracy # 2." The concluding paragraph of this memo reads:

> A number of the defendants in Conspiracy # 1 appear in Conspiracy # 2. AUSA Lavin, SDNY, may decide to merge these two conspiracies by using the evidence in Conspiracy # 2 to support the more extensive Conspiracy # 1.

Obviously, 75 Cr. 5, the superseding indictment, was precipitated at least in part by Agent Harris' memorandum.[10] The "single conspiracy" charged therein was, in substance, a product of the Government's imagination.

█ Since the indictment charges one overall conspiracy and the proof shows a series of smaller ones, there has been a material variance. Remaining for our consideration is the question of which defendants were so prejudiced by the variance as to be entitled to a reversal of their convictions. *See Berger v. United States, supra,* 295 U.S. at 82, 55 S.Ct.

---

**9.** 18 U.S.C. § 3500.

**10.** While we recognize that Agent Harris' memo predated *Sperling,* we cannot ignore the

fact that the superseding indictment was handed down three months after we issued our warning in *Sperling.*

629;[11] *United States v. Kotteakos, supra; United States v. Miley, supra,* at 1207; Fed.R.Crim.P. 52(a). Although the prejudice caused by a variance can take many forms, we are concerned here solely with what Judge Friendly described in *Miley, supra,* at 1209, as a spillover effect: the transference of guilt from members of one conspiracy to members of another.[12] *See Kotteakos v. United States, supra,* 328 at 774, 66 S.Ct. 1239.

■ It may generally be conceded that the possibility of prejudice resulting from a variance increases with the number of defendants tried and the number of conspiracies proven. *Blumenthal v. United States,* 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Miley, supra,* at 1209; *Note, supra,* 57 Colum.L.Rev. at 402. "Numbers are vitally important in trial, especially in criminal matters." *United States v. Kotteakos, supra,* 1328 U.S. at 772, 66 S.Ct. at 1252. Indeed, the major distinguishing factor between the Supreme Court's finding of no prejudice in *Berger* and its contrary conclusion in *Kotteakos* was the difference in the number of defendants and conspiracies. While we recognize that the question of prejudice is not solely quantitative, a consideration of the "numbers" involved in the case seems an appropriate starting point for our analysis.

■ *Berger* involved only four defendants. In the instant case, the indictment named twenty-nine defendants, and the additional thirty-one unindicted alleged co-conspirators brought the total individuals involved at the onset to sixty. As a result of unavailability, severances or pleas of guilty, the number of defendants was reduced to seventeen by the time the case went to the jury. These are impressive figures even when compared with *Kotteakos.* There, thirty-two persons were indicted, and four more were named as unindicted co-conspirators. Only nineteen defendants proceeded to trial; and, by the time the case reached the jury, only thirteen were left.

While defendants are easily counted, conspiracies are less readily computable.[13] Several conclusions, however, appear obvious. First, it seems clear that the transaction engaged in by the "Florida quartet" was a completely independent conspiracy. Second, the Matthews-Harrison rip-off bears, at best, a tenuous relation to any other transaction. Third, the Lucas rip-off is connected, albeit weakly, to the Flynn rip-off by the identity of several of the participants and the ultimate use of a portion of the Lucas proceeds to transport the thieves to Florida. We fail to perceive, however, a common purpose uniting the Lucas and Flynn deals. One involved no more than a cash theft; the other had as its goal the acquisition of a massive narcotics supply and the distribution thereof. *See United States v. Butler, supra,* at 1255.

Numerous other transactions were testified to at trial of which Guerra-Pearson and Angley-Serrano deals[14] and the Samuels and manita rip-offs[15] are but four modest examples. Giving the Government the benefit of the doubt, we deem these to be irrelevant evidence rather than proof of additional conspiracies. Our best estimate, therefore, is that the proof herein showed at least four separate conspiracies. We see no need to be more precise. *See Kotteakos*

---

**11.** "The true inquiry," as stated in *Berger,* "is not whether there has been a variance in proof but whether there has been such a variance as to 'affect the substantial rights' of the accused," 295 U.S. at 82, 55 S.Ct. at 630.

**12.** The record discloses no hearsay emanating from a member of one of the conspiracies used to the detriment of a member of another, *United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir. 1975), and no problem of "surprise," *Berger v.*

*United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

**13.** *Kotteakos* itself made no precise determination, concluding only that "at least eight and perhaps more" separate and independent conspiracies were actually proved at trial. 328 U.S. at 754–755, 66 S.Ct. at 1243.

**14.** See n.7.

**15.** See n.3.

*v. United States, supra,* 328 U.S. at 754, 66 S.Ct. 1239; *United States v. Miley, supra,* at 1209.

In the number of conspiracies proven, this case fits between *Berger* (two conspiracies) and *Kotteakos* (eight conspiracies). In reversing all the convictions before it, the *Kotteakos* Court concluded that the line separating prejudicial and harmless variances fell somewhere between the two decisions. 328 U.S. at 774, 66 S.Ct. 1239. For the second time in six months, our Court is called upon to further identify this line.

In *United States v. Miley, supra,* a case involving at least two and at most three conspiracies, we found that the variance between the indictment and the proof prejudiced no defendant. In *Miley,* however, only nine persons were indicted, and only five of these proceeded to trial. The *Miley* trial lasted only five days; the instant case took nearly four weeks to try. In *Miley,* the crimes of the various appellants were not markedly different; here they scarcely resembled one another. These factors, alone, however, do not compel a different result. "In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of *stare decisis* by what has been done in similar situations." *Kotteakos v. United States, supra,* at 762, 66 S.Ct. at 1246. We turn, therefore, to a consideration of the trial below.

Under the guise of its single conspiracy theory, the Government subjected each of the seven appellants to voluminous testimony relating to unconnected crimes in which he took no part. Appellants Bertolotti, Thompson and Camperlingo, active participants in the "Florida quartet" deal, but in no way tied in with any of the other conspiracies nor shown to have dealt with Rossi, Coralluzzo or their associates on any prior or subsequent occasion, were forced to sit through weeks of damaging testimony on the acquisition and distribution of the Flynn cocaine and the cash thefts from

Matthews, Harrison and Lucas. Appellants DeLuca and Angley, concededly involved in the Flynn transaction, were likewise subjected to a deluge of evidence relating to at least three other conspiracies in which they played no role. Because of their overlapping involvement in more than one of the proven conspiracies, the prejudice to appellants Capotorto and Guerra is less glaring. *See Monroe v. United States,* 234 F.2d 49, 53, *cert. denied,* 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956); *United States v. Benjamin,* 328 F.2d 854 (2d Cir.), *cert. denied sub nom. Howard v. United States,* 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964); *United States v. Borelli,* 336 F.2d 376, 386 (2d Cir. 1964), *cert. denied sub nom. Cinquegrano v. United States,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). *Compare United States v. Russano,* 257 F.2d 712, 715 (2d Cir. 1958). We, nevertheless, find clear evidence of prejudice to these two as well. Criminal they may have been, but their guilt did not permit violation of their "right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." *Kotteakos v. United States, supra,* 328 U.S. at 775, 66 S.Ct. at 1253.

In view of our summary of the various conspiracies which appears at the onset of this opinion, we believe it unnecessary to engage in a detailed recitation of the inherent prejudice in the evidence presented. The possibilities of spill-over effect from testimony on these transactions are patent when the number of conspiracies, the number of defendants and the volume of evidence are weighed against the ability of the jury to give each defendant the individual consideration our system requires. *See* Recent Case, 95 U.Pa.L.Rev. 411, 413 n.7 (1947). We do, however, wish to briefly focus on one of the more troublesome items of evidence, not merely as a specific example of the prejudice suffered by defendants below, but, as well, for its illustration of the inherent dangers of combining unrelated criminal acts under the roof of an alleged single conspiracy.

In late summer or early fall of 1973, the Westchester District Attorney placed a court authorized wiretap on the telephone of Peter Mengrone.[16] Tapes of fifty-five of the intercepted calls, containing obscenities and racial slurs as well as substantial irrelevant banter, were played to the jury. These conversations, purportedly introduced as evidence of narcotics negotiations between Mengrone, on behalf of Frank Lucas, and several individuals on behalf of Rossi, were nothing more than a series of charades by the Rossi forces seeking to defraud Lucas of his $30,000. Appellant Guerra's voice appears on almost half the tapes. Except for the appearance of Capotorto's name on three of the tape transcripts, none of the remaining appellants either participated or was mentioned, in any of the fifty-five taped conversations. While admittedly the tapes may have been probative of the Lucas rip-off, they have no relevance to any of the other transactions proved at trial. The prejudicial effect, however, of requiring the jury to spend two entire days listening to obviously shocking and inflammatory discussions about assault, kidnapping, guns and narcotics cannot be underestimated. No defendant ought to have a jury which is considering his guilt or innocence hear evidence of this sort absent proof connecting him with the subject matter discussed. With respect to at least five of the appellants, no such proof was ever convincingly produced.

■ Because we cannot say that the errors committed below had no influence on the jury's verdict, we reverse appellants' convictions. In the exercise of our power under 28 U.S.C. § 2106 to "direct the entry of such appropriate judgment . . . as may be just under the circumstances," we have examined the record in order to determine whether the way should be left open for a new trial for any or all of them. *Yates v. United States,* 354 U.S. 298, 327, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); *United States v. Russano, supra,* at 716.

The starting point for our inquiry must be the indictment itself. Since each of the overt acts set forth therein related solely to the acquisition and distribution of the Flynn cocaine, the indictment might conceivably be construed to cover only that conspiracy. We do not believe, however, that the scope of a charged conspiracy is properly measured by the nature of the overt acts alone. Moreover, other factors indicate that the charged conspiracy and the Flynn transaction were not intended to be synonymous. First, the testimony of Albert Rossi before the grand jury went well beyond the Flynn episode. Indeed, almost half his testimony before the grand jury that produced the superseding indictment related to the deal with the "Florida quartet." The second persuasive factor is the face of the indictment itself. Count One charged a conspiracy commencing in January 1973. Plans for the Flynn acquisition began no earlier than July 1973. The third consideration is the view of the indictment taken by the Government. While admittedly the prosecutors are not the final judges on the question, their interpretation must be given some weight where we seek to ascertain their initial intentions. The Government's view taken before and during the trial, and adhered to on appeal, is that each of the transactions engineered by Rossi and Coralluzzo was part of a single conspiracy.

We conclude that, for purposes of future proceedings in the District Court, this Court should not attempt to define either the boundaries of, or the participants in, the conspiracy charged in the indictment. The Government's evidence may be sufficient to prove any of a number of distinct conspiracies. Under these circumstances, a dismissal of the indictment *in toto* at this juncture would not be in the interests of justice. *United States v. Russano, supra,* at 716. *See Bryan v. United States,* 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950). Accordingly, we remand for further proceed-

---

16. See our previous discussion of the Lucas rip-off for a placement of this wiretap in its proper context.

ings in conformity with this opinion. *Kotteakos v. United States, supra,* 328 U.S. at 777, 66 S.Ct. 1239. Should the Government decide to retry this case on the basis of the existing indictment, the District Court will have the benefit both of our decision and the trial record in deciding appropriate motions to sever. *See United States v. Miley, supra,* at 1209–1210.

## III. OTHER ISSUES

Since a retrial is probable, we express our views on several additional issues which have been raised.

■■■ Appellants contend that the superseding indictment, 75 Cr. 5, was invalid. On January 6, 1975, the day the trial was set to begin, the Government discovered that the grand jury testimony of Albert Rossi used to obtain Indictment 74 Cr. 620 made no mention of defendant Raymond Thompson. Accordingly, the Government went before a second grand jury to obtain a superseding indictment. Rossi again testified but, instead of reiterating his previous testimony, merely supplemented it. Accordingly, his testimony named only ten of the indicted defendants and occupied less than three pages of transcript.[17] Appellants contend that the second grand jury never considered the earlier testimony of Rossi and that, therefore, the denial by the trial judge of the motion to dismiss the indictment as based on insufficient evidence was erroneous. Our review of the transcript of Albert Rossi's January 6th testimony reveals that the transcripts of his prior testimony were both identified by him and presented to the grand jury as exhibits. In any event, "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate . . . evidence." *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). While certain situations permit us to dismiss indictments in the exercise of our supervisory powers where we

deem it wise, *United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972), this is not such an instance.

■■■ Appellants' next assertion of error relates to the trial judge's charge that, in determining whether defendants had the requisite knowledge, wilfulness and intent, the jurors "should presume that a person intends the natural and probable consequences of his acts." This Court has previously held that where a conspiracy is charged, the Government must establish a "specific" intent to violate the substantive statute beyond a reasonable doubt. *United States v. Cangiano,* 491 F.2d 906 (2d Cir.), *cert. denied,* 419 U.S. 904, 95 S.Ct. 188, 42 L.Ed.2d 149 (1974). The charge challenged here cannot be reconciled with this requirement. *United States v. Cangiano, supra,* at 910–11. We have for many years warned against the use of this type of a charge, *United States v. Barash,* 365 F.2d 395, 402–03 (2d Cir. 1966), and are somewhat surprised at its continued appearance. Given our disposition of this case, there is no need to determine whether Judge Carter's erroneous charge constitutes reversible error. We wish, however, to take this opportunity to again stress our disapproval of the "natural and probable consequences" charge and to remind trial judges that its continued use may jeopardize otherwise sound convictions.

■■■ Judge Carter permitted the jurors to make notes during the trial. Appellants assert that the court's failure to examine these notes prior to permitting their use in the jurors' deliberations constituted error. There is no authority for this proposition. It has been long established in this Circuit that it is within the trial court's discretion to allow the jury to take notes and use them in the course of their deliberations. *United States v. Marquez,* 449 F.2d 89, 93 (2d Cir. 1971), *cert. denied,* 405 U.S. 963, 92 S.Ct. 1167, 31 L.Ed.2d 239 (1972); *United States v. Chiarella,* 184 F.2d 903, 907 (2d Cir.

17. The previous testimony used to obtain 74 Cr. 620 occupied twenty-seven pages of transcript.

1950), *vacated and remanded on other grounds,* 341 U.S. 946, 71 S.Ct. 1004, 95 L.Ed. 1370 (1951). In a case of this magnitude and duration it would seem that such notetaking would promote the individual meticulous consideration which each defendant deserves from the jury. Judge Carter carefully instructed the jury as to the limited purpose which such notes served:

> I have permitted each of you to take notes during the course of the trial. I expect you to use whatever notes you took merely as memory aids. They should not be allowed to take precedence over your independent memory of the facts.

There is clearly no abuse of discretion involved here. *Toles v. United States,* 308 F.2d 590, 594 (9th Cir. 1962), *cert. denied,* 375 U.S. 836, 84 S.Ct. 79, 11 L.Ed.2d 66 (1963); *Harris v. United States,* 261 F.2d 792, 796 (9th Cir. 1958), *cert. denied,* 360 U.S. 933, 79 S.Ct. 1446, 3 L.Ed.2d 1546 (1959).

## CONCLUSION

Reversed and remanded for further proceedings in accordance with this decision.

HENRY J. FRIENDLY, Circuit Judge (concurring):

Applauding Judge Van Graafeiland's opinion as I do, I would go further in one respect, namely, by directing dismissal of the indictment rather than leaving the district court an uncharted discretion whether and how to proceed with this incubus. The opinion convincingly demonstrates that the indictment cannot fairly be read as charging the Flynn conspiracy alone. Granted that we have authority to take the course directed by my brother, see *United States v. Russano,* 257 F.2d 712, 716 (2 Cir. 1958), we are not obliged to do so; one reason why the *Russano* court believed that dismissal "would not be in the interests of justice" doubtless was that, as to one of the two conspiracies, the statute of limitations apparently had run. Here the statute of limitations

would present no obstacle to new indictments and neither, if *Ball v. United States,* 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), retains the health I believe it has, would double jeopardy.

Under such circumstances the interests of the judicial system, of the defendants and, for that matter, of the Government would be best served by dismissing the indictment for failure of proof of the single conspiracy charged and allowing the Government to seek new indictments for the several conspiracies to which the evidence points. However, in order to permit a disposition to be made, I subordinate my personal views and join in Judge Van Graafeiland's opinion.

MOORE, Circuit Judge (concurring and dissenting):

The indictment in issue charges twenty-nine defendants with a conspiracy to distribute and possess with intent to distribute narcotic drugs. There is no question of the involvement of the appellants in this questionable enterprise. The majority concerns itself with the procedural niceties of bringing the gravity of their respective participations before a jury for determination.

The facts portraying the roles of these drug traffickers have been so ably and lucidly set forth by Judge Van Graafeiland that I will mention only briefly my cause of disagreement with the legal conclusions drawn therefrom.

As stated by the majority, Rossi and Coralluzzo were the principal participants. They drew around them satellites of more or less magnitude. In any narcotics conspiracy there is bound to be a wide difference both in participation and in degree of culpability. And every defendant need not participate in every transaction. The critical elements are possession and distribution and there can be no question but that both were convincingly (to the jury) established.

My disagreement with the majority is that they regard the various transactions involved in obtaining the drugs as separate conspiracies, whereas I look upon

the swindles, the so-called rip-offs and related activities as merely the *means* used to obtain possession without payment. Thus, for example, I find no separate convocation having as its object the theft from Flynn. He only entered the picture as a source of narcotics. In short, some of the defendants gained possession of the drugs by intimidation and force. But, as stated, the means employed did not lessen the primary objective which was to possess so as to distribute.

There would be little point in re-analyzing the respective degrees of culpability of each of the defendants since a re-trial may eventually take place. In every multi-defendant narcotics trial there are bound to be periods during which certain defendants will have to listen to testimony directed towards the guilt of others. Were the possibility of some spill-over effect held to be reversibly prejudicial, a principle of individual trials would be created. However, such is not the law.

I would, therefore, affirm the convictions of Capotorto, DeLuca, Angley and Guerra and reverse and remand for a new trial as to Bertolotti, Camperlingo and Thompson.