UNITED STATES of America, Appellee,

v.

John JOHANSEN, Defendant–Appellant.

No. 1839, Docket 95–1066.

United States Court of Appeals,
Second Circuit.

Argued April 26, 1995.

Decided May 4, 1995.

As Amended May 11, 1995.

---

Lawrence S. Bader, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City (Christopher J. Gunther, of counsel), for defendant-appellant.

Bradley D. Simon, Asst. U.S. Atty., for the E.D.N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Emily Berger, Asst. U.S. Atty., of counsel), for petitioner-appellee.

Before LUMBARD, McLAUGHLIN and LEVAL, Circuit Judges.

McLAUGHLIN, Circuit Judge:

John Johansen was charged with conspiracy to commit credit card fraud, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(b)(2), 3551 *et seq.*, and substantive credit card fraud, in violation of 18 U.S.C. §§ 2, 1029(a)(2), 3551 *et seq.* He was tried with three other defendants in the United States District Court for the Eastern District of New York (Thomas C. Platt, then Chief Judge). Following a jury trial, Johansen was convicted on both counts. The district court sentenced him to twelve months' imprisonment, and he is currently serving that sentence.

On expedited appeal, Johansen argues that he was deprived of a fair trial because the evidence proved, at most, a series of smaller conspiracies, not the single conspiracy charged in the indictment. We agree, and accordingly, reverse the judgment of conviction on both counts, and remand for a new trial. The mandate shall issue forthwith.

## BACKGROUND

In 1988, Perry Louros introduced his friend, John Johansen, to Jeff Barwick, the owner of a Long Island car repair and automotive shop called Jeff's Auto Toys. From late 1991 to early 1992, Barwick allowed Johansen to use stolen credit cards to buy about $3,000 worth of merchandise at Jeff's Auto Toys. During the same period, Johansen used an unauthorized credit card to obtain small amounts of cash on over fifty occasions from a Long Island Texaco station.

In addition to processing fraudulent transactions for Johansen, Barwick allowed another individual, William Degel, to use unauthorized credit cards to pay for auto repair work at Jeff's Auto Toys. Barwick also "ran cards" for Degel so that Degel could pay off a debt to Louis Ferrante, who allegedly was connected to John Gotti, Jr.

On one occasion, Barwick gave Degel a tip that a certain electronics store was a good target for a robbery because a large amount of cash was stored there. Degel, in turn, passed the tip on to his creditor, Ferrante, who broke into the store but found little cash. Ferrante blamed Barwick for the bad tip and for Degel's failure to pay off his loan.

Ferrante, accompanied by Degel, confronted Barwick and stole his Corvette at gunpoint. Ferrante said that he would bring it back when Degel satisfied the debt. Barwick continued processing cards for Degel until he was sure that Degel had enough money to pay his debt to Ferrante, and then Barwick demanded that Ferrante return his Corvette. Ferrante and others brought Barwick to a garage in Queens, beat him about the head, face and torso, shot him in the leg, and left him for dead. Barwick, however, survived the attack, and Ferrante then threatened to kill Barwick if he talked to the police. As a result of these incidents, Barwick got out of the business of processing fraudulent credit cards, and Jeff's Auto Toys subsequently went out of existence.

In October 1992, Johansen and Louros approached Seth Rosenberg, who used to work at Jeff's Auto Toys but who was now employed at Parkway Car Stereo ("Parkway"), and asked him "to run credit cards for them like Jeff [Barwick] used to for John [Johansen]." Unbeknownst to Johansen and Louros, Rosenberg was already cooperating with the government in its investigation of Jeff's Auto Toys. On the instructions of a Secret Service agent, Rosenberg assured Johansen and Louros that he would help them to make fraudulent purchases at Parkway.

Two days later, Johansen and Louros returned to Parkway, where the agent was conducting surveillance. While Louros was trying to make a fraudulent purchase with a credit card, a state trooper, totally uncon-

nected to the investigation, happened to enter the store. Alarmed by the trooper's presence, Louros left Parkway without completing the transaction and Johansen retreated to the back of the store. The Secret Service agent arrested Johansen, but found no credit cards on him. The next day, the credit card that Louros had attempted to use in the aborted transaction was found on the floor of Parkway near where Johansen was arrested.

Barwick, Degel, Ferrante, Louros and Johansen were charged in a three-count indictment. Count One alleged that all five defendants had conspired to commit credit card fraud in excess of $1,000 during a one-year period, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(b)(2), 3551 et seq. Count Two alleged the substantive crime: that the five defendants committed credit card fraud in excess of $1,000, in violation of 18 U.S.C. §§ 2, 1029(a)(2), 3551 et seq. Count Three alleged that three of the defendants, Barwick, Degel, and Ferrante, possessed fifteen or more unauthorized credit cards with intent to defraud, in violation of 18 U.S.C. §§ 2, 1029(a)(3), 3551 et seq.

Barwick pled guilty before trial and testified for the government. Johansen moved for a severance, but the court denied his motion. Thus, Ferrante, Degel, Louros, and Johansen were tried together.

Following a jury trial, Johansen was convicted on Counts One and Two. The district court sentenced him to twelve months' imprisonment, the upper end of the applicable Sentencing Guidelines range. Johansen now appeals on the grounds that he was deprived of a fair trial because the evidence proved, at most, a series of smaller conspiracies, not the single conspiracy charged in the indictment.

## DISCUSSION

Noting that the indictment alleges a single conspiracy involving all five defendants, Johansen argues that the proof at trial failed to show any connection between him and Degel and Ferrante, other than that, on separate occasions, they all used Barwick's services to pass fraudulent cards at Jeff's Auto Toys. He contends that the evidence showed, at most, separate and independent conspiracies. From this, he concludes that there was a "variance" between the indictment, which alleged a single conspiracy, and the proof at trial, which, at best, tended to prove several independent conspiracies. See United States v. Bertolotti, 529 F.2d 149, 154 (2d Cir.1975) ("When convictions have been obtained on the theory that all defendants were members of single conspiracy although, in fact, the proof disclosed multiple conspiracies, the error of variance has been committed.") (citing Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) and Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). He argues that this variance prejudiced him to the point of denying him a fair trial because he was linked, at trial, with Degel and Ferrante, whose unrelated crimes involved fierce violence.

To decide whether such a variance exists and, if so, whether it denied a defendant a fair trial, we employ a two-part analysis. See United States v. Alessi, 638 F.2d 466, 472–73 (2d Cir.1980). First, we must determine whether the government sufficiently proved the conspiracy alleged in the indictment, and that the defendant was a member of that conspiracy. Kotteakos, 328 U.S. at 764–65, 66 S.Ct. at 1247–48; Alessi, 638 F.2d at 473; Bertolotti, 529 F.2d at 156–57; United States v. Miley, 513 F.2d 1191, 1209 (2d Cir.), cert. denied, 423 U.S. 842, 96 S.Ct. 74, 75, 46 L.Ed.2d 62 (1975). Second, if the evidence fails to support such a finding, we must then determine whether the defendant was substantially prejudiced by the variance between the indictment and the proof. Berger, 295 U.S. at 81–82, 55 S.Ct. at 630–31; Kotteakos, 328 U.S. at 764–65, 66 S.Ct. at 1247–48; Alessi, 638 F.2d at 473; Bertolotti, 529 F.2d at 157; Miley, 513 F.2d at 1207.

### I. Single/Multiple Conspiracies

Whether the government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or, instead, has proven several independent conspiracies is a question of fact for a properly instructed jury. Alessi, 638 F.2d at 472; United States v. Calbas, 821 F.2d 887, 892 (2d Cir.1987), cert. denied, 485

U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988); *United States v. Murray,* 618 F.2d 892, 902 (2d Cir.1980). Johansen does not claim any error in the trial court's instructions to the jury.

■ To determine whether a single conspiracy or multiple conspiracies have been proven, we focus on what agreement, if any, the jury could reasonably have found to exist vis-a-vis each defendant. *Alessi,* 638 F.2d at 473. Thus, we review the scope of the criminal enterprises actually proven at trial to evaluate whether any of them fits the pattern of the conspiracy alleged in the indictment. *Id.* We then weigh Johansen's conduct and statements to determine whether a jury could reasonably infer that he participated in the alleged enterprise with a consciousness of its general nature and extent. *Id.; see United States v. Borelli,* 336 F.2d 376, 383–84 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); 1 Leonard B. Sand, *et al.,* Modern Federal Jury Instructions 19–30 (1995) ("In determining whether a jury could have found a single conspiracy, courts generally examine three factors: (1) whether there was a common goal, (2) the nature of the scheme, and (3) overlapping of participants in the various dealings.").

■ The evidence here provided a sufficient basis for the jury to find that several credit card fraud conspiracies existed—one between Barwick, Ferrante, and Degel; one between Barwick and Johansen; and a third between Johansen and Louros—each of which fell "within the words of the indictment." *See Berger,* 295 U.S. at 82–83, 55 S.Ct. at 631. There is no evidence, however, linking them together in a single overall conspiracy. Indeed, the only evidence linking Johansen to Ferrante and Degel was that Barwick "ran cards" for them on separate, unrelated occasions.

The government offered not a whit of evidence that Johansen was aware of the existence of Ferrante and Degel, that they shared a common goal, or that Johansen knew that Barwick was processing cards for persons other than himself. The evidence was simply insufficient to support a finding of a single conspiracy. *See Kotteakos,* 328 U.S. at 755, 773–74, 66 S.Ct. at 1243, 1252;

*Bertolotti,* 529 F.2d at 155 (holding that "the evidence reveals a sufficient basis for the jury to be satisfied beyond a reasonable doubt that each of the asserted transactions took place, but no evidence linking them together in a single overall conspiracy") (citations omitted). Thus, we conclude that the single conspiracy charged in the indictment "was, in substance, a product of the Government's imagination." *Bertolotti,* 529 F.2d at 155.

## II.   *Prejudice*

■ Because the indictment charges a single conspiracy to commit credit card fraud, but the evidence shows multiple conspiracies to commit credit card fraud, there is a variance between the allegation in the indictment and the proof at trial. *Id.* Even where such a variance exists, however, we reverse a conviction only upon a showing of substantial prejudice, i.e. that the evidence proving the conspiracies in which the defendant did *not* participate prejudiced the case against him in the conspiracy to which he *was* a party. *See Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. at 1247–48; *Berger,* 295 U.S. at 81–83, 55 S.Ct. at 630–31; *Alessi,* 638 F.2d at 474; *Bertolotti,* 529 F.2d at 155–56; *Miley,* 513 F.2d at 1207.

■ In evaluating whether prejudice to a particular defendant has occurred, we consider several factors, including: (1) whether the trial court gave a jury charge, pursuant to *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), allowing the defendant to be convicted for substantive offenses committed by another; (2) whether statements of persons not in a conspiracy with the defendant were used against him; (3) whether there was a prejudicial "spillover" because of a large number of improperly joined defendants; and (4) whether shocking or inflammatory evidence came in against the defendant. *See Alessi,* 638 F.2d at 475; *Miley,* 513 F.2d at 1207–09.

Here, there was no *Pinkerton* charge. Neither Ferrante's nor Degel's statements were offered against Johansen. Only four defendants were tried together. Thus, the first three factors are not present.

The evidence of violence and mob connections pertinent to Ferrante and Degel, however, was also introduced against Johansen. Johansen was tried with unrelated defendants who engaged in large-scale credit card fraud (over $250,000 in transactions for Degel and Ferrante versus $7,000–$8,000 in transactions for Johansen). Ferrante was reportedly associated with John Gotti, Jr., committed several armed robberies, attempted to kill Barwick and then threatened to finish the job if Barwick talked to the police. The receipt of this evidence against Johansen caused prejudice. *See Bertolotti,* 529 F.2d at 158 (holding that defendant was prejudiced at trial by two days of testimony about assault, kidnapping, guns and narcotics although there was no evidence linking the defendant to these acts); *United States v. Cardascia,* 951 F.2d 474, 483 (2d Cir.1991) ("Relief by severance may be more appropriate when the unrelated evidence reflects activities of a violent nature because the risk of substantial prejudice is greater."); *United States v. Winter,* 663 F.2d 1120, 1139 (1st Cir.1981) (finding prejudice "beyond rescue" where two defendants, who fixed one horse race, were tried with "members of a massive race fixing ring that employed bribery and force and violence as its modus operandi"), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1249, 1250, 75 L.Ed.2d 479 (1983). The court's charge, furthermore, instructed the jury that if "a conspiracy existed and ... the defendant under consideration was one of the members, then ... the acts knowingly done by any person likewise found to be a member, may be considered by the jury as evidence ... as to the defendant." This invited the jury to consider Ferrante's brutality as evidence against Johansen.

Although the introduction of unrelated evidence of violence may not always be prejudicial, under the facts presented here Johansen was severely prejudiced by the receipt against him of the evidence of Ferrante's brutal conduct. Under all the circumstances present here, including the absence of conspiratorial connection between Johansen and Ferrante, the much larger scale of Ferrante's criminal activity, Ferrante's violence and mob connections, the absence of a limiting instruction coupled with the explicit invita-

tion to the jury to consider the acts of one conspirator against another, we conclude that Johansen suffered prejudice. Absent adequate protection by limiting instructions, the trial of Johansen should have been severed. *See Bertolotti,* 529 F.2d at 158–59; *see also Kotteakos,* 328 U.S. at 773, 66 S.Ct. at 1252 ("Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it."). Thus, because of this prejudice, we reverse the judgment of conviction on both counts and remand the case for a new trial.

Johansen also contends that he was improperly prevented from introducing evidence of alleged police intimidation of witnesses, and that the district court sentenced him to the maximum allowable sentence under the Guidelines in retaliation for his exercise of his right to stand trial. Because we reverse and remand for a new trial on both counts, we do not reach either of these issues.

## CONCLUSION

We reverse Johansen's conviction on both counts and remand for a new trial. The mandate shall issue forthwith.

REVERSED and REMANDED for a new trial.