UNITED STATES of America,

v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed Rashed Daoud Al-'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

Nos. S6 98 CRIM. 1023 LBS.

United States District Court,
S.D. New York.

March 30, 2000.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, Kenneth Karas, Patrick Fitzgerald, Michael J. Garcia, Paul Butler, Assistant United States Attorneys, Paul McAllister, Charles D. Adler, George Goltzer, New York City, for Defendant Salim.

James Roth, Lloyd Epstein, New York City, for Defendant Mohamed.

Samuel Schmidt, Joshua Dratel, Deborah I. Meyer, New York City, for Defendant El Hage.

Michael Young, Carl J. Herman, Sandra L. Babcock, New York City, for Defendant Odeh.

Leonard Joy, Robert Tucker, Mark Gombiner, David Brück, New York City, for Defendant Al-'Owhali.

Jeremy Schneider, David Stern, David Ruhnke, New York City, for Defendant Khamis Mohamed.

## OPINION

SAND, District Judge.

The Defendants are charged with numerous offenses arising out of their alleged involvement in an international terrorist organization led by Defendant Usama Bin Laden ("Bin Laden") and that organization's alleged involvement in the August, 1998 bombings of the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. Collectively, they seek a dismissal of the Indictment, S(6) 98 Cr. 1023(LBS) ("the Indictment"), dismissal of particular counts from the Indictment, the striking of alleged surplusage from the Indictment, disqualification of certain attorneys from serving as advocates for the Government in this case, and disqualification of United States citizens from serving on the jury. For the reasons set forth below, all of the requested relief is denied.

### INTRODUCTION

This is the third of a series of three opinions in which the Court has addressed the first set of pre-trial motions filed by the Defendants. Because all of the parties to this case anticipated protracted pretrial proceedings and a lengthy discovery process, the Court sought to expedite matters by ordering the Defendants to file promptly, well in advance of trial,[1] any motions that did not require the completion of a significant amount of discovery.[2] That set of motions was filed on December 6, 1999[3] and became fully submitted, after extensive briefing and oral argument, on February 29, 2000.

1. Trial is currently scheduled to begin on September 5, 2000.

2. The Court's order applied to "[a]ll motions, other than those which relate to discovery not yet made, or which relate to the determination of . . ." whether the death penalty will be sought. (Transcript of Proceedings of September 29, 1999, at 9.) The Court also directed the Defendants to "make an explicit statement" at the time they filed their initial set of motions as to any additional motions that they believed "may be brought but as to which the factual development" was, as of that time, "not complete." (Id. at 9.) Since that time, discovery has proceeded and the parties have conferred to identify those items of discovery that are to be handled on a priority basis because they relate to future motions. (See Letter from Herman to Fitzgerald of Mar. 8, 2000, at ¶¶ 1–2.) A pretrial conference has been scheduled for April 11, 2000, at which time the Court will address any disputes that might exist with respect to that prioritized, motion-related discovery. (See id. at ¶ 4.) The Defendants will then have approximately thirty days, or until May 15, 2000, to file any additional motions, including specifically those that have been identified in their initial submissions. (See id.)

3. Defendant Khalfan Khamis Mohamed ("K.K.Mohamed") was not brought into federal custody and arraigned on the Indictment until October 8, 1999, after the Court's order with respect to the motion schedule had been entered. We therefore granted him 90 additional days to file his initial set of motions. (See Letter from Schneider to the Court of Nov. 24, 1999.) Those motions were filed on March 7, 2000 and were answered by the Government on March 20, 2000. (See Letter from Garcia to the Court of March 20, 2000.) K.K. Mohamed's motions are therefore fully submitted and are addressed in this opinion.

As explained in two previous opinions, the Court has already granted in part and denied in part Defendant Odeh's motion to dismiss the Indictment for lack of jurisdiction. *see United States v. Bin Laden,* 92 F.Supp.2d 225 (S.D.N.Y.2000) (dismissing four of the Indictment's 267 counts), and ordered the Government to file a bill of particulars, *see United States v. Bin Laden,* —— F.Supp.2d —— (S.D.N.Y.2000). Presently before the Court are all of the other motions filed on December 6, including several challenges to the face of the Indictment—broad challenges to the Indictment as a whole and more focused applications directed at particular counts. The Defendants have also moved to disqualify two attorneys from serving as advocates for the Government at trial and in certain pre-trial proceedings, and seek an order that would prevent United States citizens from numerically dominating the jury.

Although we believe that, as a matter of sound pre-trial management, the Court's expedited motion schedule was necessary and beneficial, an unfortunate consequence of that schedule is that some of the claims that have been advanced by the Defendants are premature at this time. We recognize that the Defendants had to file those motions at such an early date to avoid inadvertently waiving any rights. Where we indicate below that a particular claim is premature, it is not meant as a rebuke to the Defendants or their counsel, but only to indicate that, in those instances, our denial of relief is without prejudice to the application being renewed at a more appropriate time.

## BACKGROUND

Much of the factual and legal background of this case is fully set forth in the Court's memorandum and order addressing the Defendants' requests for a bill of particulars. *See* U.S. v. *Bin Laden,* 92 F.Supp.2d at 232. Familiarity with that memorandum is presumed. Some of the motions addressed below, however, relate to aspects of the Government's investigation of this case and portions of the Indictment which were not implicated by the Defendants' earlier motions. We therefore summarize some additional background information in the pages that follow.

The United States Attorney's Office in the Southern District of New York has been investigating Bin Laden and the al Qaeda organization he is said to have founded, since "late 1995 or early 1996." (Affirmation of Patrick J. Fitzgerald of Jan. 24, 2000 ("Fitzgerald Affirmation") at ¶ 6; Affirmation of Kenneth M. Karas ("Karas Affirmation") of Mar. 20, 2000, at ¶ 7; *see also* Indictment at ¶ 66 (dating the investigation back to 1996).) That investigation has been led by Assistant United States Attorney ("AUSA") Patrick J. Fitzgerald and AUSA Kenneth M. Karas, and has been conducted in conjunction with the New York office of the Federal Bureau of Investigation ("FBI") (*see* Fitzgerald Affirmation at ¶ 6; Karas Affirmation at ¶ 7) as well as "a number of other federal, state and local agencies" (Indictment at ¶ 66). The evidence gathered by that investigation was presented to the June 1996 Special Grand Jury in this district ("the Grand Jury"). (*See* Fitzgerald Affirmation at ¶ 7.)

One of the witnesses who testified before the Grand Jury was Defendant Wadih El Hage ("El Hage"). Mr. El Hage appeared before the Grand Jury,[4] for the first time, on September 24, 1997. (*See id.*) At that time, according to the Indictment, the Grand Jury's investigation focused on al Qaeda's "structure and opera-

---

4. El Hage actually appeared before a different Grand Jury, the May 1996 Additional Grand Jury in the Southern District of New York, because of a scheduling problem encountered with the June 1996 Special Grand Jury. (*See id.*) However, as AUSA Fitzgerald explains in his affirmation, the May 1996 Additional Grand Jury "in reality sat in place of" the June 1996 Special Grand Jury and, for the purpose of considering the motions presently before the Court, can be considered to have been the same Grand Jury. (*See id.* at ¶ 8.)

tional status" in various places around the world, the targets of al Qaeda's terrorist activities, and any relationships that might have existed between El Hage and various al Qaeda leaders. (*See* Indictment at ¶ 66.) According to the Government, Mr. El Hage testified falsely about each of those subjects. (*See* Indictment at ¶¶ 74–76, 79; Declaration of Sam A. Schmidt of Nov. 29, 1999, at ¶¶ 31, 34.)

On August 7, 1998, explosives were detonated, nearly simultaneously, in the areas surrounding the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, causing numerous casualties and extensive property damage ("the embassy bombings"). Fitzgerald and Karas traveled to Nairobi and Dar es Salaam, respectively, to investigate. (*See* Fitzgerald Affirmation at ¶ 6; Karas Affirmation at ¶ 7.) Two other lawyers from the Department of Justice as well as "a large number of FBI agents" accompanied them. (*Id.*) In Nairobi, the American investigators, working together with Kenyan police, interviewed Defendant Mohamed Sadeek Odeh ("Odeh"), over a period of two weeks, between August 15 and August 27, 1998. (*See id.* at ¶ 4.) AUSA Fitzgerald participated in some of those interviews but affirms that he "was never present for any questioning of Odeh at any time when [he] was not accompanied by at least one of the FBI agents." (*Id.*) Most of the time, according to Fitzgerald, two FBI agents and three Kenyan police officials were present when he interviewed Odeh. (*Id.*)

In the aftermath of the bombing, the Grand Jury expanded the scope of its investigation into Bin Laden and al Qaeda to include an investigation into that group's possible involvement in the embassy bombings. (*See* Indictment at ¶ 70(iii)–70(iv).) On September 16, 1998, Mr. El Hage appeared, once again, to testify before the Grand Jury. El Hage was told that the Grand Jury was investigating possible in-

stances of perjury before a grand jury and that he was a target of that investigation. He was then asked many of the same questions that had been asked during his Grand Jury appearance one year earlier, and was asked about the embassy bombings. According to the Government, Mr. El Hage repeated the false testimony he had provided a year earlier. (*See* Indictment at ¶¶ 81–84, 86, 88–89.)

Immediately after testifying on September 16, 1998, Mr. El Hage was arrested. He was indicted a few days later on eight counts of committing perjury before a federal grand jury. That indictment was soon superseded by another, filed on October 7, 1998, which named Defendants Odeh and Mohamed Rashed Daoud Al-'Owhali ("Al-'Owhali") as Defendants and included allegations relating to the embassy bombings. Over the next several months, the Grand Jury returned five more superseding indictments, culminating with the Indictment presently before the Court,[5] which names 15 Defendants and accuses them of participating in several long-lasting, wide-ranging conspiracies to attack United States personnel (including civilians) and property. *See Bin Laden*, 92 F.Supp.2d at 233 (reviewing duration and geographical scope of conspiracies charged in the Indictment).

The indictment charges the 15 named Defendants with 267 discrete criminal offenses. Eleven of the Defendants ("the bombing Defendants") (*i.e.*, all except Mamdouh Mahmud Salim ("Salim"), Khaled Al Fawwaz, Ali Mohammed, and El Hage) are charged with 229 counts of murder (*see id.* at ¶¶ 40–59), as well as nine other substantive offenses (*see id.* at ¶¶ 32–39, 56–65), based on the embassy bombings ("the substantive bombing counts"). El Hage is charged with twenty counts of perjury before a federal grand jury and three counts of making false statements to special agents of the Feder-

---

**5.** The Government has indicated that it intends to seek another superseding indictment following the filing of this opinion.

al Bureau of Investigation ("FBI"). (*See id.* at ¶¶ 66–96.) Each of the Defendants is also charged with participating in at least five distinct criminal conspiracies; El Hage and Ali Mohamed are accused of participating in six. (*See id.* at ¶¶ 10–31.) Although each conspiracy is charged under a different provision of the federal criminal code,[6] the allegations overlap to a significant degree. The six conspiracies are, for the most part, alleged to have had the same four criminal objectives: (1) murder of United States nationals; (2) killing of United States military personnel serving in Somalia and on the Saudi Arabian peninsula; (3) killing of United States nationals employed at the United States Embassies in Kenya and Tanzania; and (4) concealment of the conspirators' activities through the use of front companies, false identity and travel documents, coded correspondence, and by providing false information to authorities. (*See id.* at ¶¶ 11, 15, 19.)[7] All but one[8] of the conspiracies are alleged to have been furthered by the commission of the same set of 144 overt acts, which are set forth in the Indictment in some detail. (*See id.* at ¶ 12.)

6. Count One alleges a conspiracy to kill United States nationals, in violation of 18 U.S.C. § 2332(b); Count Two accuses El Hage and Ali Mohamed of conspiring to murder, kidnap, and maim United States nationals outside of the United States, in violation of 18 U.S.C. § 956(a); Count Three alleges a conspiracy to commit murder, in violation of 18 U.S.C. §§ 1111, 1114, and 1116; Count Four charges the defendants with conspiring to use weapons of mass destruction against United States nationals, in violation of 18 U.S.C. §§ 2332a(a)(1) and 2332a(a)(3); Count Five charges a conspiracy to destroy buildings and property, in violation of 18 U.S.C. § 844(f); and Count Six accuses the defendants of conspiring to attack national defense utilities, in violation of 18 U.S.C. §§ 2155(a) and 2155(b).

7. Count Four lists only the bombing of the embassies and attacking "American military facilities in the Gulf Region and the Horn of Africa, and members of the American military stationed in Saudi Arabia, Yemen, Somalia and elsewhere with bombs" as the objects of the conspiracy. (Indictment at ¶ 23.) Count Six does not separately set forth the objects of the conspiracy. (*See id.* at ¶¶ 29–31.)

Defendant Khalfan Khamis Mohamed ("K.K.Mohamed"), was arrested in South Africa on October 5, 1999.[9] (*See* Affirmation of David A. Ruhnke, of Mar. 7, 2000, at ¶ 4.) After his arrest, he was interviewed for several hours by Special Agents of the FBI. (*See id.*) AUSA Karas traveled to South Africa and participated in further interviews of K.K. Mohamed during his flight back to the United States. (*See* Karas Affirmation of ¶ 3.) As with Fitzgerald's participation in the interviews of Odeh, Karas attests that he "was never present for any questioning of K.K. Mohamed at any time when [he] was not in the presence of at least one of the two FBI special agents conducting the interview" (Karas Affirmation at ¶ 4), and that "at all times during the flight from South Africa to the United States, other law enforcement personnel were present." (*Id.*)

### DISCUSSION

### I. MOTION TO DISMISS THE INDICTMENT ON DUE PROCESS GROUNDS

The broadest challenge to the Indictment that is before the Court is Mr. Al-'Owhali's[10] motion to dismiss the Indict-

8. The Indictment expressly states that several of the overt acts alleged were *not* acts in furtherance of the conspiracy charged in Count Six. (*See id.* at ¶ 31.)

9. In the interim between the arraignment of Odeh and Al-'Owhali and the arrest of K.K. Mohamed, two other Defendants, Salim and Ali Mohamed, had been brought into federal custody.

10. Throughout this opinion, we refer to each motion as having been made by the Defendant who filed it. We note, however, that Salim, El Hage, and K.K. Mohamed have included in their submissions a request to participate in any beneficial relief granted by the Court. (*See* Salim's Notice of Motion at ¶ 13; El-Hage's Notice of Motion at ¶ (d); K.K. Mohamed's Notice of Motion at ¶ 5; Al-'Owhali's Notice of Motion at ¶ .) Since we order no relief, that request is moot. But for the sake of clarity, we wish it to be understood that by referring to a motion as having been made by one particular Defendant we do not indicate that the other Defendants would not have participated in any corresponding relief.

ment, in its entirety,[11] because the conspiracies it alleges are "so enormous in scope, vague in detail, and various in objectives that it denies [the defendant's] rights under the Sixth Amendment ... to be adequately informed of the nature of the charges against him and his rights under the Fifth Amendment to due process of law, indictment by a properly instructed grand jury, and right not to be tried *en masse* for offenses committed by others." (Al-'Owhali's Notice of Motion at ¶ 1.) According to Al-'Owhali', the Indictment

> labels a decade-long international political and religious movement involving dozens of countries, scores of organizations, and thousands of persons as a single 'conspiracy' responsible for an equally sweeping array of events ranging from the deaths of United States Marines in Somalia to attacks on U.S. military facilities in Saudi Arabia and Yemen to (apparently) the bombing of the World Trade Center.

(*Id.* at 1–2.) "Whatever its attractions as a political theory or foreign policy guide," Al-'Owhali' concludes, "the mammoth, all-encompassing, decade-long, world-wide Islamic 'conspiracy' alleged in the indictment cannot serve as a constitutional basis for a fair trial for the individual defendants." (*Id.* at 6.) Instead, he contends, it "presage[s] a political 'show' trial, incompatible with the most basic demands of the Consitution." (Id.)

Despite Mr. Al-'Owhali's dramatic exhortation, once the discrete legal issues he raises are separately identified and examined in accordance with settled principles of law, it becomes clear that they cannot withstand scrutiny. Despite the force of his rhetoric, Mr. Al-'Owhali is plainly not entitled to the relief he requests.

## A. An Indictment's "Notice–Related" Functions [12]

We begin by focusing on the claim that the Indictment provides inadequate notice of the charges that the Defendants must be prepared to meet. An indictment must "be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R.Crim.P. 7(c)(1). That requirement, which is grounded in "the Sixth Amendment's guarantee of the right of an accused to be informed of the nature and cause of the accusation," *United States v. Tomasetta*, 429 F.2d 978, 979 (1st Cir.1970) (internal quotation marks omitted), is satisfied if an indictment "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (citing *Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932); *United States v. Debrow*, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953)); *see also Russell v. United States*, 369 U.S. 749, 763, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (describing an indictment as sufficient if it "contains the elements of the offense to be charged, and sufficiently apprises the defendant of what he must be prepared to meet") (citation and internal quotation marks omitted).

"An indictment need do little more than to track the language of the statute charged and state the time and

11. The Government, in responding to this motion, treats it as a motion only to dismiss Count One, (*see* Government's Memorandum of Law at 56), perhaps because Mr. Al-'Owhali's arguments refer only to the conspiracy counts in the Indictment, and frequently do so using the singular term "conspiracy." Although our analysis would be the same in either case (i.e., whether the motion is a motion to dismiss Count One or a motion to dismiss the Indictment as a whole), for the sake of clarity, we note that the relief sought by the motion is dismissal of the Indictment as a whole.

12. *United States v. Miller*, 471 U.S. 130, 135, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985).

place (in approximate terms) of the alleged crime." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992) (citing *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975)).[13] In this case, the Indictment does much more. It contains two Background sections (which, together, comprise about 15 pages (*see* Indictment at ¶¶ 1–9, 66–73)) and a list of 144 overt acts allegedly committed in furtherance of the six charged conspiracies (*see id.* at ¶ 12). Mr. Al-'Owhali nevertheless claims that the Indictment provides inadequate notice of the crimes charged because he claims that its factual allegations are "vague." He objects that:

> other than the bombings of the Kenyan and Tanzanian embassies, and some scant and oblique references to the conspiracy's supposed responsibility for the death of United States soldiers in Somalia, the indictment is almost entirely devoid of specifics as to what conduct is at issue and/or what defendants are supposed to have done.

(Al-'Owhali's Memorandum of Law at 12.)

Our review of the Indictment, however, discloses several specific allegations, with respect to Mr. Al-'Owhali in particular, as to what conduct is at issue and what he is said to have done. The Indictment alleges that Mr. Al-'Owhali received training in an al Qaeda-sponsored camp in "explosives, hijacking, kidnaping, assassination and intelligence techniques" (Indictment at ¶ 12eee); that he met with Bin Laden in 1996 and "asked him for a 'mission'" (*id.* at ¶ 12jjj); that he attended a press conference in 1998 at which Bin Laden "repeated his intention to kill Americans" (*id.* at ¶ 12tttt); that he filmed a videotape in July, 1998 "to celebrate [his] anticipated 'martyrdom' in a bombing operation to be conducted against United States interests in East Africa" (*id.* at ¶ 12ggggg); that he met with other al Qaeda members during the first week of August, 1998 "to make final preparations for the bombing of the United States Embassy in Nairobi, Kenya" (*id.* at ¶ 12nnnnn); that he "reconnoitered" the Embassy a few days before the bombing (id. at ¶ 12rrrrr); that he rode in a vehicle containing a bomb to the Embassy on the morning it was attacked, and that he threw a "stun grenade ... in the direction of a security guard" at the Embassy, minutes before the bombs were detonated (*id.* at ¶ 12zzzzz). The Court finds nothing vague about those allegations.

■ The Indictment is somewhat less specific with respect to how that conduct furthered the conspiracies' four criminal objectives. However, "[i]t is well settled that in an indictment for conspiring to commit an offense ... it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy ... or to state such object with the detail which would be required in an indictment for committing the substantive offense." *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927) (citations omitted). Because "the crime of conspiracy is complete whether or not the substantive offense which was its object was committed," *United States v. Wydermyer,* 51 F.3d 319, 325 (2d Cir.1995) (citation omitted), a conspiracy indictment need not set forth detailed information about a conspiracy's criminal objectives.

We conclude that although the Indictment alleges the conspiracies' criminal objectives in general terms, its inclusion of so many specific overt acts allegedly committed in furtherance thereof, more than adequately satisfies the requirements of Fed-

---

13. Of course, tracking the language of the statute is only sufficient "as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling,* 418 U.S. at 117, 94 S.Ct. 2887 (quoting *United States v. Carll,* 105 U.S. 611, 612, 26 L.Ed. 1135 (1881)). If the terms of a statute are generic or merely descriptive of a criminal act, then an indictment which tracks statutory language would be insufficient. *See Russell,* 369 U.S. at 764, 82 S.Ct. 1038.

eral Rule of Criminal Procedure 7(c) and of the Sixth Amendment. *See Wydermyer*, 51 F.3d at 326; *United States v. Werme*, 939 F.2d 108, 112–13 (3d Cir.1991) (citations omitted); *United States v. Miller*, 26 F.Supp.2d 415, 425 (N.D.N.Y.1998) (citations omitted); *cf. United States v. Cecil*, 608 F.2d 1294 (9th Cir.1979) (dismissing conspiracy indictment as insufficient when "[a]side from tracking the language of the pertinent statutes," it made only two specific allegations ... that the conspiracies occurred in Arizona, Mexico, and elsewhere and ... the names of some of the alleged co-conspirators). To the extent that Mr. Al-'Owhali's motion to dismiss the Indictment is based on an asserted lack of notice, that motion is denied.[14]

### B. Due Process

Mr. Al-'Owhali's objections to the Indictment are not limited to the question of notice. He also contends that the Indictment violates due process because it presages a lengthy trial that, in his view, is likely to deprive him of several of the basic rights guaranteed by the Due Process Clause of the Fifth Amendment.

■ The Court is not aware, however, of any case (and the Defendants do not direct us to one) in which an indictment has been dismissed prior to trial on the ground that a charged conspiracy could not possibly be the subject of a constitutionally adequate trial. To the contrary, it appears to be well settled that a conspiracy "may be alleged as broadly as the conspiracy really was," *Burton v. United States*, 175 F.2d 960, 963 (5th Cir.1949) (citation omitted), and that "[i]f the Government honestly believes ... that many

defendants have played a part in the conspiracy they may be—and probably should be—joined as defendants," *United States v. Dardi*, 330 F.2d 316, 329 (2d Cir.1964); *see also United States v. Stromberg*, 22 F.R.D. 513, 521 (S.D.N.Y.1957) (citation omitted).

Mr. Al-'Owhali relies, in part, on *United States v. Gonsalves*, 691 F.2d 1310 (9th Cir.1982), in which the court affirmed the trial court's dismissal of a conspiracy indictment because when the trial court had found that the charged conspiracy was "such a complex monstrosity as to be unmanageable." *Id.* at 1320. Even in that case, however, where the court expressly found that any trial of the charges contained in the indictment would be unmanageable, it did not conclude that the indictment violated due process. The legal basis for the court's dismissal was its discretionary, supervisory power to manage its docket. *See id.* at 1315–22. The Supreme Court vacated the Ninth Circuit's opinion in light of its intervening decision in *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), *see United States v. Gonsalves*, 464 U.S. 806, 806, 104 S.Ct. 54, 78 L.Ed.2d 73 (1983), and, on remand, the Ninth Circuit reversed, 781 F.2d 1319 (1986).[15] *Gonsalves*, therefore, does not support Al-'Owhali's due process claim.

The only other cases cited by Mr. Al-'Owhali in support of his due process claim are cases in which a court has reversed a conviction after a trial. For example, Al-'Owhali urges us to rely on *United States v. Bertolotti*, 529 F.2d 149 (2d Cir.1975), in which the court reversed the defendants' convictions, noting that the Government

---

14. We confine our analysis to the conspiracy counts in the Indictment because, although the motion seeks dismissal of the Indictment as a whole, *see supra* n. 11, its analysis is clearly limited to the six conspiracy counts. In fact, as can be seen in the passage excerpted above, see supra p. 608, Mr. Al-'Owhali appears to concede that the Indictment's description of the substantive bombing offenses provides adequate notice.

15. Although its decision was based on a reassessment, in light of *Hasting*, of the proper exercise of a federal court's supervisory power, the court noted that it had "every confidence that jurors are as capable to deal with complexities in criminal cases as they are in complex civil cases." *Id.* at 1321 n. 2 (citing *In re U.S. Financial Securities Litigation*, 609 F.2d 411, 427–31 (9th Cir.1979)).

had improperly "merged several conspiracies for the sake of convenience." *Id.* at 155. But the court reached that conclusion only after examining the record developed at trial and determining that there was a material variance between the charges in the Indictment and those proved at trial. *See id.* at 155–59; *see also Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (reversing a conviction because of variance between single conspiracy charged in indictment and evidence demonstrating multiple conspiracies); *United States v. Sperling,* 506 F.2d 1323, 1340–43 (2d Cir.1974) (warning the Government not to charge multiple conspiracies in an indictment alleging a single conspiracy). Although Al-'Owhali cites *Bertolotti,* as well as *United States v. Cambindo Valencia,* 609 F.2d 603 (2d Cir.1979) (reversing convictions on ground that evidence of multiple conspiracies materially varied from the single conspiracy charged in indictment), for the proposition that "[t]he Second Circuit has condemned the practice of joining together large numbers of defendants and acts by claiming that they are all part of a single conspiracy" (Al-'Owhali's Memorandum of Law at 10), those cases differ significantly from this one in that they involved the reversal of convictions [16] after trial on the grounds of a material variance rather than a dismissal of an indictment, prior to trial, on due process grounds. We do not be-

lieve, therefore, that they provide any support for the extraordinary relief Al-'Owhali requests. Although the Court recognizes that ensuring the Defendants a fair trial on the charges contained in the Indictment will require careful attention and a thorough effort from all parties involved,[17] we cannot conclude at this stage that such a trial is impossible. Al-'Owhali's motion to dismiss the Indictment on the ground that any resulting trial will violate due process [18] is, therefore, denied.

### C. Trial *En Masse*

■ The final element of Mr. Al-'Owhali's multi-faceted application is his claim that the Indictment should be dismissed because it violates his "right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." (Al-'Owhali's Memorandum of Law at 11 (citing *Kotteakos,* 328 U.S. at 775, 66 S.Ct. 1239).) Even if we were to agree with Mr. Al-'Owhali that a single trial on the Indictment would violate his rights (as to which we express no view at this time), we do not believe that dismissal of the Indictment, as opposed to a severance, is the appropriate remedy.

The Court has already begun to implement the procedure suggested in *United States v. Casamento,* 887 F.2d 1141 (2d Cir.1989), when faced with the prospect of a complex, multi-defendant criminal trial.[19]

---

**16.** *But see Bertolotti,* 529 F.2d at 160 (Friendly, J., concurring) (urging dismissal of the Indictment as well as reversal).

**17.** *See generally United States v. Rahman,* 189 F.3d 88, 160 (2d Cir.1999) (noting challenges addressed by trial judge in managing trial of complex terrorism conspiracy); *United States v. Gallo,* 668 F.Supp. 736, 754–56 (E.D.N.Y. 1987) (noting many difficulties that arise from long criminal trials).

**18.** Al-'Owhali also claims that the trial will undoubtedly violate due process because of the inflammatory nature of the charges and the impossibility of adequate investigations and preparation by defense counsel. We believe, however, that less drastic measures than dismissing the Indictment can accommodate those concerns. For example, it was

because of our recognition of the heavy burden that the Indictment placed on defense counsel that we ordered the Government to file a bill of particulars. *See Bin Laden,* 92 F.Supp.2d at 233–34. With respect to the inflammatory nature of the charges, cautionary instructions, or some alternative measure, will be considered at a more appropriate time.

**19.** The *Casamento* court suggested that:

First, the district judge should elicit from the prosecutor a good-faith estimate of the time reasonably anticipated to present the government's case....

In those cases where the judge determines that the time for presentation of the prosecution's case will exceed four months, the judge should oblige the prosecutor to pres-

We have asked the prosecution to estimate the time it anticipates will be required to present its case and the Government has responded that it expects its case to be presented in six months. (*See* Transcript of Proceedings of Sept. 29, 1999, at 13.) On another occasion, the Court directed the Government to "strictly comply with the mandate" expressed in *Casamento.* (Transcript of Proceedings of Dec. 13, 1999, at 13.)

At this time, however, we believe that it is still premature to address the question of whether separate trials or a joint trial of all Defendants is appropriate. For example, the Attorney General has not yet decided whether the Government will seek capital punishment for any of the Defendants. The Court therefore defers further consideration of the severance question. The parties have suggested that further submissions on the severance question will be presented later this Spring. (*See* Transcript of Proceedings of Feb. 29, 2000, at 121.)

To the extent that Mr. Al-'Owhali's motion is premised upon his claim that a joint trial will deprive him of due process, we defer decision until such time as we are able to consider the many complex questions surrounding the severance issue and have obtained the views of all the parties on this matter.

## II. MOTION TO DISMISS COUNTS 1 AND 3–244 FOR LACK OF VENUE

Defendant Odeh[20] raises another broad challenge to the Indictment. He claims that nearly the entire indictment must be dismissed because this Court is an unconstitutional venue for prosecuting the crimes charged. He seeks the dismissal of every count in the Indictment in which he is named as a Defendant.[21]

■■■ As a general rule, all criminal prosecutions must be brought in the district in which the offense was committed. *See* U.S. Const. art. III, § 2; Fed. R.Crim.P. 18; see generally *United States v. Reed,* 773 F.2d 477, 479–82 (2d Cir.1985) (discussing constitutional and policy bases for criminal venue law). When an offense is committed in more than one district, it may be prosecuted in any district in which it was "begun, continued, or completed." 18 U.S.C.A. § 3237(a) (West 2000); *see United States v. Naranjo,* 14 F.3d 145, 147 (2d Cir.1994). When an offense is committed outside the jurisdiction of any particular state, it may be prosecuted in that district in which the defendant, or at least one of a group of defendants, is first arrested or to which the defendant is first brought. *See* 18 U.S.C.A. § 3238 (West 2000).

### 1. The Conspiracy Counts

■■■ A conspiracy prosecution can be brought "in any district in which 'an overt act in furtherance of the conspiracy was committed by any of the coconspirators.'" *Naranjo,* 14 F.3d at 147 (citing *United States v. Ramirez–Amaya,* 812 F.2d 813, 816 (2d Cir.1987)). Although the Indictment plainly alleges at least three overt acts in furtherance of the charged conspiracies that occurred in the Southern Dis-

---

ent a reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials for groups of defendants.... [W]e do not contemplate a contested hearing nor precise findings on this subject. A submission by the prosecutor, a response by the defendants seeking a severance, and a conclusion by the judge will suffice.
*Id.* at 1151–52.

20. K.K. Mohamed joins, and adopts by reference, Mr. Odeh's motion. (*See* K.K. Mohamed's Notice of Motion at ¶ 1.)

21. Odeh does not move to dismiss Count Two (in which only El Hage and Ali Mohamed are named as Defendants), although his analysis would be fully applicable to that count. Nor does he seek the dismissal of Counts 245–67, the perjury and false statements counts, as to which his analysis would not apply.

trict of New York (El–Hage's and Ali Mohamed's perjury before the Grand Jury), Odeh claims that this Court is an improper venue. In support of this claim, Odeh advances the (apparently novel) argument that the overt acts that occurred in this district and which, therefore are critical to our determination as to venue, must bear a "causal connection" to the conspiracies.

However, the Indictment plainly alleges that those acts furthered the charged conspiracies and, to that extent at least, would seem clearly to be causally connected thereto. We do not believe that § 3237(a) requires a showing of any additional connection. Odeh's citation to *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), on this point is totally inapposite.[22] In that case, the court vacated a conviction because the federal undercover agents who investigated the case inappropriately "manufactured federal jurisdiction," by traveling out of state to make phone calls to their targets when there was no reason for the calls to have been made other than to establish federal jurisdiction. *Id.* at 683. Even assuming that *Archer's* "manufactured jurisdiction" analysis is appropriate in the somewhat different context of a challenge to venue, *cf. United States v. Lewis*, 676 F.2d 508, 511 n. 3 (11th Cir. 1982) (distinguishing *Archer* on ground that it applies to jurisdiction rather than venue), for the Court to find venue to have been improperly "manufactured" under *Archer* we would have to find that the perjury and false statements alleged here were the product of entrapment or outra-

geous government conduct, or that an essential element of the venue statute was satisfied only by a Defendant's involuntary act. *See Wallace*, 85 F.3d at 1065–66 (citations omitted). No claim of entrapment or outrageous conduct has been advanced, and we have little trouble concluding that the alleged perjury before the Grand Jury was a voluntary act. We conclude therefore that § 3237(a) provides an adequate basis for establishing venue in this district for the conspiracy charges contained in the Indictment.

### 2. The Substantive Counts

Odeh's contention with respect to the substantive bombing counts, Counts 7–244, is that § 3238, on which the Government relies, only applies to offenses committed entirely outside the jurisdiction of any particular state, a position that is apparently supported by language contained in *United States v. Gilboe*, 684 F.2d 235, 239 (2d Cir.1982). Under that interpretation, § 3238 would not establish venue in a particular district of the United States for an offense that was committed partially within the United States and partially outside the jurisdiction of any particular state. Instead, venue would only lie in that district (or districts) in which part of the offense occurred.

The Government disputes Mr. Odeh's construction of § 3238. It argues that the statement from *Gilboe* upon which Odeh relies is dictum and that it is in conflict with several decisions in other circuits.[23]

---

**22.** "Courts that have construed *Archer*" in subsequent cases "have taken pains to limit its applicability and to explain that 'manufactured jurisdiction' as an independent doctrine is a dubious concept." *United States v. Wallace*, 85 F.3d 1063, 1065 (2d Cir.1996) (citing *United States v. Keats*, 937 F.2d 58, 64–65 (2d Cir.1991); *United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir.1994); *United States v. Podolsky*, 798 F.2d 177, 180–81 (7th Cir.1986)).

**23.** *See United States v. Levy Auto Parts*, 787 F.2d 946, 950–52 (4th Cir.1986) (finding venue appropriate under § 3238 when conspiracy was "essentially foreign," even when some

overt acts occurred in United States); *United States v. Erwin*, 602 F.2d 1183, 1185 (5th Cir.1979) (per curiam) ("That venue may also be appropriate in another district will not divest venue properly established under § 3238"); *United States v. Williams*, 589 F.2d 210, 213 (5th Cir.1979), *adopted in pertinent part*, 617 F.2d 1063, 1071 (5th Cir.1980) (en banc); *see also United States v. Jensen*, 93 F.3d 667, 671 (9th Cir.1996) (Fletcher, J., concurring) ("That the defendants also operated their vessels within the District of Alaska does not remove section 3238's applicability—the alleged offense was still 'begun or committed' upon the high seas . . . .") (citing

We need not resolve that dispute here however because, even assuming that Mr. Odeh's interpretation of § 3238 is correct, we are not convinced that the substantive bombing counts of the Indictment allege conduct that occurred within the jurisdiction of a particular state. There is no doubt that the conspiracies charged in the Indictment allege numerous overt acts that occurred in the United States.[24] But that litany of overt acts is only incorporated by reference into the conspiracy counts; it is not incorporated into Counts 7–244. The only connection between the substantive bombing counts and conduct that occurred in the United States is through the Indictment's "Background" section (see Indictment at ¶¶ 1–9), which refers to acts that occurred in the United States (see, e.g., Indictment at ¶¶ 6, 9). We believe that it is clear, however, that "Background" information, which is included in the Indictment solely to aid the jury, is not part of the offenses charged. Counts 7–244, therefore, all allege conduct that oc-

curred exclusively outside the jurisdiction of any particular state. Mr. Odeh's motion to dismiss those counts for lack of venue is therefore denied.[25]

## III. MOTIONS TO DISMISS COUNTS FROM THE INDICTMENT ON THE GROUND THAT THEY ARE MULTIPLICITOUS [26]

The Indictment alleges 267 discrete criminal offenses, 238 of which arise out of the same two criminal episodes—the embassy bombings. Defendants Al-'Owhali and El Hage ask the Court to dismiss many of those counts, as well as a few of the Indictment's other counts, on the ground that they are impermissibly multiplicitous. For the reasons set forth below, each such request is denied.

### 1. The Double Jeopardy Clause

■■■ The Defendants advance a variety of legal theories in support of their claims that the Indictment is multiplicitous. One

8A James A. Moore et al., *Moore's Federal Practice* ¶ 18.06[3] (2d ed.1995)) (additional citations omitted).

**24.** One of the alleged conspirators, Defendant Ali Mohamed, is accused of making false statements, while residing in California, to law enforcement officials (*see* Indictment at ¶¶ 12ss, 12eeee) and in connection with an application for a security clearance (*see id.* at ¶ 12ww). Ali Mohamed is also accused of lying to a grand jury in the Southern District of New York. (*See id.* at 12kkkkkk.) Another alleged conspirator, Defendant Wadih el-Hage, is accused of making false statements to law enforcement officials in Arlington, Texas (*see id.* at ¶ 12fffff), and of committing perjury before two different federal grand juries in the Southern District of New York (*see id.* at ¶¶ 12dddd, 12iiiiii). Two of the conspirators are accused of meeting in California (*see id.* at ¶ 12xx) and of exchanging correspondence that originated in the United States (*see id.* at ¶¶ 12tt, 12uu). Letters were also allegedly sent to co-conspirators in Florida (*see id.* at ¶¶ 12zz, 12nnn, 12ppp) and co-conspirators in Florida sent messages to defendants (*see id.* at ¶¶ 12qqq, 12rrr, 12ttt.)

**25.** We note that the Government is still obligated, of course, to present evidence at trial

substantiating, by a preponderance of the evidence, that venue exists in this district. *See* *United States v. Rosa*, 17 F.3d 1531, 1541–42 (2d Cir.1994). Our conclusion is, at this time, limited to the adequacy of the allegations with respect to venue, the truth of which we assume for the purpose of considering this motion.

**26.** In some cases, "whether an aggregate of acts constitute a single course of conduct and therefore a single offense, or more than one, may not be capable of ascertainment merely from the bare allegations of an information and may have to await the trial on the facts." *United States v. Miller*, 26 F.Supp.2d 415, 422–23 (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 224, 73 S.Ct. 227, 97 L.Ed. 260 (1952) (internal quotation marks omitted) and citing *United States v. Walker*, 524 F.Supp. 1029, 1030 (E.D.Pa. 1981); *United States v. Stofsky*, 409 F.Supp. 609, 617–18 (S.D.N.Y.1973)). In this case, however, as we explain below, each of the Defendants' motions claiming that counts are multiplicitous involves purely legal questions and therefore is ripe for adjudication at this point. In such circumstances, it is appropriate to consider motions seeking dismissal of multiplicitous counts prior to trial. *See* *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981).

basis upon which courts have dismissed multiplicitous counts from an indictment is the Double Jeopardy Clause of the Fifth Amendment, which provides that no person "shall be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see United States v. Chacko*, 169 F.3d 140, 145 (2d Cir.1999) (citing *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993)). The Double Jeopardy Clause prohibits both successive prosecutions and the imposition of multiple punishments for the same offense. *See Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (citations omitted). Because a multiplicitous indictment would, at least in theory,[27] expose a defendant to multiple punishments for the same offense, the Double Jeopardy Clause requires the Court to dismiss from the Indictment any counts that the Court finds to be multiplicitous. *See Chacko*, 169 F.3d at 145; *see also United States v. Fiore*, 821 F.2d 127, 130 (2d Cir.1987) ("The multiplicity doctrine is based upon the double jeopardy clause ... which assures that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.") (quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (internal quotation marks omitted)).

 "An indictment is multiplicitous," in the sense forbidden by the Double Jeopardy Clause, "when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Walsh*, 194 F.3d 37, 46 (2d Cir.1999) (quoting *Chacko*, 169 F.3d at 145) (internal quotation marks omitted); *see also United States v. Holmes*, 44 F.3d 1150, 1153–54 (2d Cir.1995). Our analysis as to whether multiple counts in the Indictment charge what is in law and fact a "single offense" is based on the same prin-

ciples that are regularly applied by courts when interpreting the Double Jeopardy Clause. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Id.* (citations omitted); *see United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (citations omitted) (confirming that *Blockburger* test is proper standard for determining whether Double Jeopardy Clause bars multiple punishments).

### a. Substantive Bombing Counts

Because the Indictment focuses on two allegedly similar bombings, its substantive bombing counts come in pairs. Counts Seven and Eight, for example, charge roughly identical violations of 18 U.S.C. §§ 844(f)(1), (f)(3), and 2. (*See* Indictment at ¶¶ 33, 35.) Count Seven charges the bombing Defendants with violating those statutes in connection with the bombing of the United States Embassy in Nairobi (*see* Indictment at ¶ 33); Count Eight charges them with the same violations in connection with the bombing of the United States Embassy in Dar es Salaam (*see id.* at ¶ 35). Similarly, Counts Nine and Ten charge nearly identical violations of 18 U.S.C. § 2332a(a)(1) and (a)(3) in connection with the bombings in Nairobi (Count Nine) and Dar es Salaam (Count Ten). (*See* id. at ¶¶ 37, 39.) Counts 11–222 (Nairobi) and Counts 223–233 (Dar es Salaam) charge analogous counts of murder with respect to each of the two bombings (*see* id. at ¶¶ 42, 43).

---

**27.** As the Court suggested during oral argument, the contemporary sentencing guidelines regime, with its detailed grouping rules, *see* United States Sentencing Commission, *Guide-* *lines Manual* §§ 3D1.1–.5 (Nov.1998), mutes the force of the Defendants' contention that a multiplicitous indictment may subject them to multiple punishments for the same offense.

■ None of the Defendants contend that those parallel allegations are multiplicitous of each other (i.e., that Count Eight is multiplicitous of Count Seven). Plainly, two different bombings would permit prosecution for two different offenses under the same statute. Al-'Owhali's claim is that the Government is only permitted to charge him and his co-defendants with one of those pairs of allegations because, he reasons, each pair "would be proved by identical evidence...." (Al-'Owhali's Memorandum of Law at 21.)

The relevant inquiry, however, is not whether the same evidence would be used to prove the different charges, but whether they are the same offense, as that term is understood in the context of the Double Jeopardy Clause. The question is whether each pair of offenses would "require[ ] proof of an additional fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180. In our view, the answer to that question is clearly affirmative. Each offense charged in the Indictment requires proof of at least one element that is not an element of any of the other offenses. Section 844(f), which penalizes the malicious destruction of government property, requires proof that government property was a target of the bombings; that element is not required by any of the other statutes upon which charges in the Indictment are based.[28] Section 2332a requires proof that a weapon of mass destruction was used in the attacks on the United States Embassies, which is not an element of any of the other offenses charged. *See United States v. McVeigh,* 940 F.Supp. 1571, 1583 (D.Colo.1996), *aff'd,* 169 F.3d 1255 (10th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 336, 145 L.Ed.2d 262 (1999) (rejecting a virtually identical argument). Finally, the Indictment's 233 substantive

murder counts, charging violations of 18 U.S.C. § 930(c) are not multiplicitous of any other counts because they require proof of a "killing," an element not required by any of the other provisions. Therefore, we conclude that the three parallel sets of substantive bombing charges—based on §§ 844(f), 2332a, and 930(c)—do not charge the same offense and are not, therefore, multiplicitous.

■ Mr. Al-'Owhali also claims that Counts 242–44, the three "use or carrying" counts in the Indictment, are multiplicitous in violation of the Double Jeopardy Clause. Each of those three counts charges that the Defendants used and carried a dangerous device during the commission of a felony.[29] They each refer, however, to a different felony. Count 242 references Count One (conspiracy to kill United States nationals); Count 243 references Count 7 (malicious destruction of Government property—Nairobi); and Count 244 references Count 8 (malicious destruction of Government property—Dar es Salaam). The Government's theory with respect to these counts is that they are not multiplicitous because "each one is based upon a predicate offense that is distinct under *Blockburger.*" (Government's Memorandum of Law at 78.) Since Counts One, Seven, and Eight are distinct under *Blockburger,* the Government reasons, Counts 242–245 are distinct as well.

Although the Second Circuit has apparently not yet addressed the question of whether distinct predicate offenses is a sufficient basis for charging distinct "use or carrying" violations, the logic of that position seems to follow directly from *Blockburger* itself. If one of the elements of a "use or carrying" charge is a predicate

---

**28.** Section 2332a penalizes the use of a weapon of mass destruction against a United States national or against United States property. The Government has indicated, however, that in a superseding indictment to be filed prior to trial, it will strike the reference to United States property in that count, leaving it with an exclusive focus on attacks against United

States nationals. (*See* Government's Memorandum of Law at 77 n. 19.)

**29.** Count 242 charges the unlawful use or carrying of a dangerous explosive as a violation of 18 U.S.C. § 844(h). Counts 243 and 244 charge violations of 18 U.S.C. § 924(c).

offense, and the predicate offenses are different, then each "use or carrying" offense requires proof of a different element. We agree, therefore, with the Government that the three "use or carrying" offenses charged in the Indictment are distinct because they are based on distinct predicate offenses. *Accord United States v. Floyd,* 81 F.3d 1517, 1527 (10th Cir.1996) (citing *United States v. Callwood,* 66 F.3d 1110, 1114 (10th Cir.1992) (quoting *United States v. Sturmoski,* 971 F.2d 452, 461 (10th Cir.1992))); *United States v. Andrews,* 75 F.3d 552, 558 (9th Cir.1996) (citing *United States v. Mathews,* 36 F.3d 821, 823 (9th Cir.1994)); *United States v. Nabors,* 901 F.2d 1351, 1358 (6th Cir.1990). Al-'Owhali's motion with respect to those three counts is, therefore, denied.

b. 18 U.S.C. § 2332a(a)

■ Count Four charges all fifteen Defendants with conspiring "to use weapons of mass destruction, to wit, bombs, against nationals of the United States ...," in violation of 18 U.S.C. §§ 2332a(a)(1) and (a)(3). (*See* Indictment at ¶ 22.) Counts Nine and Ten are parallel substantive counts, charging the bombing Defendants with using and attempting to use "a weapon of mass destruction against nationals of the United States ...," in violation of 18 U.S.C. §§ 2332a(a)(1) and (a)(3). (Indictment at ¶ 37 (Nairobi); *id.* at ¶ 39 (Dar es Salaam).) Al-'Owhali claims that the inclusion of a substantive charge of violating that statute and a charge accusing the Defendants of conspiring to violate the statute is unconstitutionally multiplicitous.

■ We disagree. The Double Jeopardy Clause does not prohibit the inclusion of separate counts in an indictment, charging a substantive offense and a conspiracy to commit that substantive offense. *See Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) ("Traditionally, the law has considered conspiracy and the completed substantive offense to be separate crimes.") (citations omitted); *United States v. Feola,* 420 U.S.

671, 693, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) ("[C]onsecutive sentences may be imposed for the conspiracy and for the underlying crime.") (citing *Callanan v. United States,* 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). Al-'Owhali recognizes this principle but argues that it does not apply here because the statute in question, 18 U.S.C. § 2332a, "does not distinguish between actual use of a weapon of mass destruction and a conspiracy to use a weapon of mass destruction." (Al-'Owhali's Memorandum at 20.) Consequently, he argues, "they charge identical conspiracies to use weapons of mass destruction against nationals and property of the United States." (Al-'Owhali's Memorandum of Law at 19.)

At its core, Al-'Owhali's argument is that the conspiracy and substantive offense in question are multiplicitous of each other because the statute prohibits them in the same section. *See* 18 U.S.C.A. § 2332a(a) ("A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction ... shall be ..." punished as specified.) We are not persuaded, however, that the inclusion of a substantive offense and a prohibition on conspiring to commit that offense in the same section of a statute alters the fundamental rule that a conspiracy and the substantive offense are separate crimes. At least one other federal criminal statute—the Hobbs Act, codified at 18 U.S.C. § 1951—proscribes a substantive offense and conspiring to commit that substantive offense in the same section. *See* 18 U.S.C.A. § 1951 (West 1999) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do...."). In *Callanan v. United States,* 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), the Supreme Court held that convictions under both the conspiracy and substantive provisions of the

Hobbs Act were not multiplicitous and could be the basis for consecutive sentences. *See id.* at 593–94, 81 S.Ct. 321. In so holding, the Court expressly noted that the general rule permitting simultaneous convictions for a substantive offense and conspiring to commit the substantive offense is applicable even when the conspiracy and the substantive offense are defined "within the same statute." *Id.* at 594, 81 S.Ct. 321 (citing *Carter v. McClaughry,* 183 U.S. 365, 22 S.Ct. 181, 46 L.Ed. 236(1902)).

Applying *Callanan* to this case, then, we conclude that violating 18 U.S.C. § 2332a(a) and conspiring to violate that statute are separate offenses. They may be charged, therefore, in separate counts of an indictment as multiple offenses. The Defendant's motion is denied.

2. Multiplicity as a Matter of Statutory Construction

[redacted] Even if two offenses are distinct for Double Jeopardy purposes, they may nevertheless be multiplicitous if the statute that defines the offense indicates that a defendant's conduct only constitutes a single violation. *See United States v. Coiro,* 922 F.2d 1008, 1014 (2d Cir.1991); *United States v. Johnpoll,* 739 F.2d 702, 714–15 (2d Cir.1984). When a defendant claims that an indictment is multiplicitous because it is based on an erroneous interpretation of a statute (rather than because it violates the Double Jeopardy Clause), our analysis focuses on Congress's intent with respect to the appropriate unit of prosecution. *See Coiro,* 922 F.2d at 1014 *see also Sanabria v. United States,* 437 U.S. 54, 70, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) (citations omitted) (explaining that Congress determines the "allowable unit of prosecution."). To ascertain congressional intent, "[w]e turn first to the language of the statute, itself, giving each word its ordinary meaning." *United States v. Lindsay,* 985 F.2d 666, 673 (2d Cir.1993) (citing *United States v. Bernier,* 954 F.2d 818, 819 (2d Cir.1992)).

[redacted] The statute as to which Al-'Owhali claims the Indictment applies an erroneous unit of prosecution is 18 U.S.C. § 930(c), which penalizes any "person who kills or attempts to kill any person in the course of . . ." committing a crime involving the unlawful possession of a firearms or other dangerous weapon in a federal facility. *See* 18 U.S.C.A. §§ 930(a)-(c) (West 2000). Al-'Owhali argues that because Congress placed that statute in a section of the criminal code entitled "Possession of firearms and dangerous weapons in Federal facilities," it intended the unit of prosecution to be "the use of a dangerous weapon during an attack on a federal facility." (Al-'Owhali's Memorandum of Law at 16.) Because the Indictment only alleges two such attacks (the two bombings), he reasons, the Indictment may only charge two violations of § 930(c), one for each bombing.

We disagree. The central operative language of the offense defined by § 930(c), in our view, is a prohibition on killing or attempting to kill a person. That the killing must occur in the course of committing another crime does not alter the statute's fundamental focus on the killing itself.[30] The Defendant's citation to *Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958), is unavailing. In that case, the Defendant was convicted upon a record at trial that appeared to show[31] that "he fired a single discharge from a shotgun into the front seat of an automo-

30. Our reading of § 930(c) is confirmed by a House Report, which notes that the section was amended to "authorize the imposition of the death penalty for the commission of first-degree murder" in certain circumstances. *See* H. Rep. 466, 103d Cong., 2d Sess.1994, *reprinted in* 1994 WL 107577; *see also* 137 Cong. Rec. S3191, 3237 (1991) (explaining that predecessor to § 930(c) was intended to "proscribe and punish killings. . . .").

31. *But see id.* at 178 nn. 6–7 (indicating that the trial was not transcribed and noting "the trial judge's recollection that 'more than one shot was fired into the car . . .' ").

bile and that the pellets wounded … two federal officers, who were transporting an arrested prisoner." *Id.* at 171, 79 S.Ct. 209. The statute in question made it a crime to "forcibly resist, oppose, impede, intimidate, or interfere with any person … while engaged in the performance of his official duties…." *Id.* at 171 n. 1, 79 S.Ct. 209 (citation omitted). The Court, after analyzing the statute's text and history, found the statute ambiguous and therefore, applying the rule of lenity, concluded that the allowable unit of prosecution was the assault on a federal officer, regardless of the number of victims injured thereby. In this case, however, for the reasons set forth above, no such ambiguity exists. The statute clearly sets forth that its focus is on a killing, rather than a disruption of a federal function, and that focus is confirmed by the statute's legislative history. *Cf. United States v. McVeigh,* 940 F.Supp. 1571, 1583 (D.Colo.1996) (distinguishing *Ladner* on similar grounds), *aff'd,* 169 F.3d 1255 (10th Cir.), *cert. denied,* — U.S. —, 120 S.Ct. 336, 145 L.Ed.2d 262 (1999). Al-'Owhali's motion to dismiss Counts 11–222 and 223–234 is therefore denied.

### 3. Perjury Counts

■ It has often been said that "a single lie merits but a single punishment…." *United States v. Berardi,* 629 F.2d 723, 729 (2d Cir.1980) (citing *United States v. Williams,* 552 F.2d 226, 228 (8th Cir.1977) (quoting *Gebhard v. United States,* 422 F.2d 281, 289–90 (9th Cir. 1970))). It is consistent with the Double Jeopardy Clause, however, to prosecute multiple, related acts of perjury through separate counts in an indictment, so long as each count constitutes a distinct offense. *Cf. United States v. Stanfa,* 685 F.2d 85, 87–89 (3d Cir.1982) (applying double jeopardy standards in reviewing allegation that

perjury counts were multiplicitous). If "proof of each falsehood necessitated the establishment of different facts," then prosecution for two counts of perjury would not be multiplicitous. *See United States v. Doulin,* 538 F.2d 466, 471 (2d Cir.1976) (citing *United States v. Tyrone,* 451 F.2d 16 (9th Cir.1971); *United States v. Andrews,* 370 F.Supp. 365 (D.Conn. 1974)); *United States v. Coiro,* 785 F.Supp. 326, 332 (E.D.N.Y.1992) (citations omitted).[32] By implication, therefore, if the same falsehood is repeated in response to different interrogators, *see United States v. Guariglia,* 757 F.Supp. 259 (S.D.N.Y.1991) (denying that indictment was multiplicitous when falsehood was stated on direct examination and repeated on cross-examination), or is repeated to different investigative bodies, *see United States v. Clarridge,* 811 F.Supp. 697, 703–04 (D.D.C.1992) (different congressional committees), it is constitutionally permissible for an indictment to allege multiple counts of perjury, based on each repetition of the lie.

Nevertheless, some courts have dismissed perjury counts from indictments as multiplicitous even though those counts allege separate and discrete criminal offenses which, ordinarily, could serve as the basis for multiple punishments. Some of those courts apparently have been motivated by a concern that the government might "bludgeon a witness who is lying by repeating and rephrasing the same question, thus creating more possible perjury counts." *Gebhard v. United States,* 422 F.2d 281, 289–90 (9th Cir.1970); *see United States v. Williams,* 552 F.2d 226, 228–29 (8th Cir.1977). Others have based their dismissal on the rationale that repetition of the same lie to the same investigative body does not "further impair the operations of the government." *United States v. Ol-*

---

**32.** *Accord United States v. Feldhacker,* 849 F.2d 293, 297–98 (8th Cir.1988) (citation omitted); *United States v. De La Torre,* 634 F.2d 792, 794–95 (5th Cir.1981); *cf. United States v. Sharpe,* 193 F.3d 852, 865 (5th Cir.

1999) (same analysis in context of multiple counts of obstruction of justice), *cert. denied,* — U.S. —, 120 S.Ct. 1202, 145 L.Ed.2d 1105 (Feb. 22, 2000).

*sowy*, 836 F.2d 439, 443 (9th Cir.1988); *see United States v. Graham*, 60 F.3d 463, 467 (8th Cir.1995); *United States v. Trent*, 949 F.2d 998, 999–1000 (9th Cir.1991).

In this case, the Government concedes that, with respect to five of the specifications of perjury with which El Hage is charged, the testimony in question was "substantially the same." Although, as the Government acknowledges, that testimony was provided to the very same investigative body—the June 1996 Special Grand Jury—it was provided on two different occasions and will therefore require proof of different facts. We believe, therefore, that those allegations are not multiplicitous in the sense forbidden by the Double Jeopardy Clause.

Moreover, there is no allegation here, as there was in *Gebhard* and *Williams*, that the prosecutors have somehow abused the Grand Jury process. *See Stanfa*, 685 F.2d at 88–89 ("We think the focus of the *Gebhard* court's concern was on governmental abuse of the grand jury process . . . .") (citing *In re Poutre*, 602 F.2d 1004, 1006 (1st Cir.1979)). El Hage does not suggest that he was subpoenaed to re-appear before the Grand Jury solely so that the Government could repeat questions which, it knew, would solicit additional acts of perjury. To the contrary, at the outset of El Hage's 1998 Grand Jury testimony, he was expressly warned that the Grand Jury was investigating possible perjury before the grand jury and that he was a target of that investigation.

Nor are we convinced, as were the courts in *Olsowy*, *Trent*, and *Graham*, that repetition of El-Hage's false testimony caused no additional impediment to the Grand Jury's investigation. On this point, *United States v. Salas–Camacho*, 859 F.2d 788, 791 (9th Cir.1988), is particularly instructive. In that case, an alleged smuggler was indicted for smuggling goods into the United States and for twice falsely denying the same. Salas–Camacho first denied that he had any items to declare in a statement he made to a primary customs inspector, whose job it was to make "a preliminary determination whether an entrant, upon declaring no goods, should be allowed beyond the customs line." *Id.* at 791. He repeated his false statement to a secondary customs inspector, whose job it was "to conduct a more searching examination. . . ." *Id.* The court, reviewing the two false statement charges, reasoned that because the two customs inspectors had distinct duties and responsibilities, a false statement made to each one impeded a separate governmental function. *See id.*

Similarly, here, when El–Hage testified in 1997, the Grand Jury was investigating Usama bin Laden's terrorist network as a general matter. El Hage's allegedly false testimony would have impeded the Grand Jury's ability to determine the members and scope of any terrorist conspiracy led by Bin Laden. But at the time El–Hage testified in 1998, the embassy bombings had occurred. The Grand Jury, therefore, had a very specific and immediate interest in identifying any individuals that might have information about those attacks. El Hage's repetition of his allegedly false testimony, therefore, impeded a related yet fundamentally distinct Grand Jury inquiry. It no longer only impeded a general investigation into who might be associated with Bin Laden; it also impeded a specific, focused inquiry into who might have bombed the United States Embassies in Nairobi and Dar–es–Salaam. Because the Grand Jury's motivation was different when El–Hage testified in 1998 than it had been in 1997, a repetition of the same false testimony caused a new, additional harm. It is, therefore, an appropriate basis for inclusion of multiple counts of perjury. *Accord Clarridge*, 811 F.Supp. at 703–04.[33]

---

**33.** In *Clarridge*, a case dealing with repetition of false testimony before two different congressional committees, Judge Greene aptly explained the rationale for including multiple perjury counts in an indictment based on a repetition of the same false testimony:

> . . . these congressional committees are comprised of different sets of Representa-

El Hage's motion to dismiss many of the perjury counts with which he is charged is therefore denied.[34]

## IV. MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT

■ Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, *see* Fed.R.Crim.P. 7(d), "[i]t has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States v. Jimenez,* 824 F.Supp. 351, 369 (S.D.N.Y.1993) (quoting *United States v. Claytor,* 52 F.R.D. 360, 361 (S.D.N.Y.1971) (internal quotation marks omitted)). A motion to strike surplusage is only granted where it is clear that the alleged surplusage is not relevant to the crime charged and is inflammatory and prejudicial. *See United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir.1996) (citing *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990) (quoting *United States v. Napolitano,* 552 F.Supp. 465, 480 (S.D.N.Y.1982))); *United States v. Elson,*

968 F.Supp. 900, 909 (S.D.N.Y.1997). "If the evidence of the allegation is admissible and relevant to the charge, then despite prejudice, the language will not be stricken." *Napolitano,* 552 F.Supp. at 480 (citing *United States v. Chas. Pfizer & Co.,* 217 F.Supp. 199, 201 (S.D.N.Y.1963)).

■ Defendant Salim seeks an order striking the following allegations from the Indictment, which he claims are surplusage: 1) any references to "terrorist groups and affiliated terrorist groups"; and 2) any irrelevant aliases. We believe, however, that those allegations (assuming they are supported by competent evidence at trial) could very well be relevant to the crimes with which Mr. Salim is charged. *See* Fed.R.Evid. 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence"). The Indictment alleges that Mr. Salim participated in five criminal conspiracies. The Govern-

tives or Senators. They and their committees may be presumed to have had separate motivations for calling Mr. Clarridge before them to testify. Since he appeared before each committee on different dates, during a rapidly unfolding scandal, the state of each committees' knowledge at the time Mr. Clarridge testified necessarily varied.....

. . . .

[T]he logical underpinning of the defendant's argument presents serious public policy problems. By asking this Court to find counts involving separate committees to be multiplicitous, the defense would place a premium on consistent perjury. Under defendant's theory, once an individual tells a lie before any committee of either branch of Congress, successive retelling of that lie before any other congressional committee even months apart, and in the context of a different inquiry, could not be punished.... [D]ifferent committees, perhaps of different branches of the legislature ... are clearly entitled to conduct their separate inquiries, unobstructed by false statements.

*Id.* Although the investigative body in this case was the same each time El Hage testified, its knowledge and motivation changed in

a manner similar to that described by Judge Greene.

34. El–Hage initially also moved to dismiss Count 248, but appears to have withdrawn that motion in light of a factual error upon which that motion was based. (*See* El–Hage's Reply Mem. at 9 n. 7.) On the other hand, the Government has agreed that Counts 253 and 264, and 256(e) and 257(b), are multiplicitous and therefore consents to the striking of Counts 264 and 257(b) and will seek a superseding indictment merging those counts. (*See* Government's Memorandum of Law at 91, 94.) With respect to five of the remaining counts—252, 253, 254(a), 259(a)-(f), and 260(m)—the Government concedes that the testimony in question is "substantially the same" as the testimony at issue in other counts, but contends that the repetition of that testimony warrants multiple perjury counts. With respect to the other three pairs of perjury counts that Mr. El Hage claims are multiplicitous, the Government disputes the similarity of the testimony. Because our analysis would lead us to deny Mr. El Hage's motion even if the testimony in question were identical, we need not resolve whether it is or is not substantially the same.

ment is permitted to prove such participation, and the existence of the alleged conspiracies, by demonstrating that Mr. Salim committed certain acts which support the inference that he agreed with others to attempt to achieve the criminal objectives set forth in the Indictment. *See United States v. Wilson,* 565 F.Supp. 1416, 1439 (S.D.N.Y.1983) ("The existence of a conspiracy and a defendant's participation therein is usually established by ... independent proof of each alleged co-conspirator's ... conduct ... and the totality of conduct of all the participants and the reasonable inferences to be drawn therefrom.") (quoting *United States v. Kahaner,* 203 F.Supp. 78, 84 (S.D.N.Y.1962)) (internal quotation marks omitted). That the groups with which he was affiliated committed terrorist acts, and that he used aliases to conceal his identity, if supported by adequate evidence, could support such an inference; those allegations are not, therefore, surplusage. Mr. Salim's motion is denied.

## V. MOTION TO PARTIALLY DISQUALIFY CERTAIN ASSISTANT UNITED STATES ATTORNEYS

Defendant Odeh seeks the disqualification of AUSA Fitzgerald from appearing in this case as an advocate for the Government both at trial and at any pre-trial proceedings which relate to events in which Mr. Fitzgerald participated. Defendant K.K. Mohamed, similarly, seeks the disqualification of AUSA Karas. The factual basis for both claims is that Fitzgerald and Karas participated in post-arrest interviews with Odeh and K.K. Mohamed, respectively. The Defendants claim that 1) they must call Fitzgerald and Karas as witnesses to testify about those interviews; and 2) that Fitzgerald and Karas might serve as improper "unsworn witnesses" for the Government. Because we find neither claim persuasive, the motions are denied.

### A. The Advocate–Witness Rule

■ "[L]awyers representing litigants should not be called as witnesses in trials involving those litigants if such testimony can be avoided consonant with the end of obtaining justice." *United States v. Alu,* 246 F.2d 29, 33 (2d Cir.1957). As the ethical rules adopted by the American Bar Association, and codified in many states, have long recognized, "[t]he roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively." American Bar Association, Code of Professional Responsibility EC 5–9 (1978); *see United States v. Birdman,* 602 F.2d 547, 553 nn. 14–16 (3d Cir.1979) (collecting cases in which courts have condemned an attorney's simultaneous service as advocate and as witness). Permitting an advocate to testify as a witnesses also creates a risk that jurors will be unable to distinguish the lawyer's argument from his testimony and might therefore erroneously "accord testimonial credit to the [lawyer]'s ... argument[s]." *United States v. Prantil,* 764 F.2d 548, 553 (9th Cir.1985) (citing *United States v. Johnston,* 690 F.2d 638, 643 (7th Cir.1982) (en banc)). Courts are quite reluctant, therefore, to permit an advocate to testify as a witness in a case in which he is representing a litigant. If a litigant's lawyer must be a witness, therefore, he can not be permitted to serve as an advocate at trial.

■ An additional problem arises when the lawyer in question is a prosecutor in a criminal case. When a prosecutor testifies, in addition to all of the concerns specified above, there is a danger that the prestige associated with the prosecutor's office might induce a jury to grant too much weight to his testimony. *See Birdman,* 602 F.2d at 553–54 & 553 n. 17; *Prantil,* 764 F.2d at 553 ("[T]he rule prevents the prestige and prominence of the prosecutor's office from being attributed to testimony by a testifying prosecutor.") (citing *United States v. Cerone,* 452 F.2d 274, 288 (7th Cir.1971)). A court may only permit a prosecutor to testify if the offer-

ing party has exhausted all other available sources for that testimony. *See Prantil*, 764 F.2d at 551–2 ("[A] defendant has an obligation to exhaust other available sources of evidence before a court should sustain a defendant's efforts to call a participating prosecutor as a witness.") (citing *United States v. West*, 680 F.2d 652, 654 (9th Cir.1982)); *United States v. Torres*, 503 F.2d 1120, 1126 (2d Cir.1974) (reversing conviction when prosecutor testified about courtroom incident involving the defendant because, inter alia, "[t]here was no showing that any of the other people in the courtroom, such as marshals, court clerks, court reporters or interpreters were unavailable"); *United States v. Regan*, 897 F.Supp. 748, 758 (S.D.N.Y.1995) ("Where witnesses other than the prosecutor can testify to the same matters in question, no compelling need exists.") (citing *Wallach*, 788 F.Supp. at 744) (additional citations omitted)), *aff'd* 103 F.3d 1072 at 1083 (2d Cir.1997).

The prohibition on a lawyer appearing as a witness in a case in which he is also serving as an advocate is grounded in important and legitimate concerns with respect to the proper functioning of the adversary system. However, the same rule carries the potential to be abused and invoked in a manner that actually distorts the adversary process. "In recognition of the fact that a move to disqualify trial counsel has inherent tactical advantages particularly when it occurs after the culmination of extensive trial preparation, the Second Circuit has required a showing of necessity from the movant." *United*

States v. Perlmutter, 637 F.Supp. 1134, 1137 (S.D.N.Y.1986) (citing *United States v. Schwartzbaum*, 527 F.2d 249 (2d Cir. 1975). Moreover, that necessity must be "compelling and legitimate." *United States v. Regan*, 103 F.3d 1072, 1083 (2d Cir.1997) (citing *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir. 1975) (citations omitted)); *see also Regan*, 897 F.Supp. at 758 ("In many criminal cases, defense counsel seek to make an issue out of the prosecutor's conduct, e.g., by cross-examining witnesses on whether prosecutors sought to influence their testimony or offered inducements for favorable testimony, and disqualification cannot be ordered every time this happens.").[35]

■ We do not find in this case that there is any compelling or legitimate need for either AUSA Fitzgerald or AUSA Karas to testify. Both prosecutors have affirmed to the Court that they did not participate in any interviews with any Defendants except in the presence of third parties. Because those third parties can testify as to everything that occurred during those interviews, any need for Fitzgerald or Karas to testify is quite limited. We agree completely with the analysis articulated by the court in *United States v. Watson*, 87 F.3d 927 (7th Cir.1996):

The advocate-witness rule does not imply "that every AUSA who interviews a suspect is precluded from representing the government at a suppression hearing regarding the suspect's statement. Far from it. The correct procedure, and one that the AUSA followed in this case,

**35.** *Accord United States v. Lopez*, No. 97 Cr. 1191(HB), 1998 WL 142338 (S.D.N.Y. Mar. 27, 1998) ("A defendant seeking to call a prosecutor as a witness must demonstrate a compelling and legitimate need to do so."); *United States v. Regan*, 897 F.Supp. 748, 758 (S.D.N.Y.1995), *aff'd*, 103 F.3d 1072, 1083 (2d Cir.1997); *United States v. Wallach*, 788 F.Supp. 739, 743–44 (S.D.N.Y.) ("The law does not liberally permit a defendant to call a prosecutor as a witness. On the contrary, a defendant must demonstrate a compelling and legitimate need to do so."), *aff'd*, 979 F.2d 612 (7th Cir.1992).

Odeh argues that the "compelling need" test only applies when disqualification is sought on the eve of trial. Whether or not he is correct (as to which we express no view), we believe that in a complex case such as this, on which Fitzgerald and Karas have been working for over four years, the final six months before trial is "the eve of trial," and that the Defendants must, therefore, demonstrate a compelling and legitimate need for a prosecutor's testimony in order to have him disqualified.

is to avoid interviewing a suspect except in the presence of a third person so that the third person can testify about the interview."

*Id.* at 932 (citing *United States v. Johnston*, 690 F.2d 638, 645 (7th Cir.1982) (en banc); *United States v. Bailin*, No. 89 Cr. 668, 1990 WL 16435 (N.D.Ill. Jan. 22, 1990)); *accord United States v. Dennis*, 843 F.2d 652, 655 (2d Cir.1988) (finding that lawyer avoided unsworn witness problem by bringing a third party into the room when interviewing a prospective witness) (citing American Bar Association Standards Relating to the Administration of Criminal Justice, Standard 4–4.3(d) (2d ed.1979)); *Lopez*, 1998 WL 142338, at \*4; *Wallach*, 788 F.Supp. at 743 ("Where witnesses other than the prosecutor can testify to the same matters or conversations, no compelling need exists.").

In some of the cases in which courts have refused to disqualify a prosecutor even though that prosecutor had been personally involved in events at issue in the trial, the court has noted a reason other than the existence of alternative witnesses, that mitigates the need for the prosecutor's testimony. *See Regan*, 103 F.3d at 1072 (noting that matters to which prosecutor would testify had been transcribed); *United States v. Tamura*, 694 F.2d 591, 601 (9th Cir.1982) (finding that prosecutor's testimony would only be duplicative impeachment of another witness's testimony and reasoning that the need for that testimony was less than compelling); *United States v. Hosford*, 782 F.2d 936 (11th Cir.1986) (substance of prosecutor's testimony transcribed). But we do not believe, as Odeh urges, that the court in any of those cases indicate that its conclusion required the existence of that factor. That Mr. Fitzgerald's and Mr. Karas's interviews with the Defendants were not transcribed, and that Mr. Fitzgerald's testimony would be for substantive purposes rather than for impeachment, are not sufficient reasons therefore for us to conclude that the need for their testimony is so compelling as to justify disqualifying them from serving as advocates in this case.

### B. Attorneys as Unsworn Witnesses

Even if he is not a necessary witness, however, a different problem can arise from an attorney's personal involvement in events that are at issue in a trial. If a witness testifies about events in which the attorney was involved, there is a danger that the jury will view that attorney as an unsworn witness, vouching for the accuracy of any testimony he elicits about events in which he was involved. *See United States v. Gotti*, 771 F.Supp. 552, 561–67 (E.D.N.Y.1991), *aff'd sub nom., United States v. Locascio*, 6 F.3d 924, 933–35 (2d Cir.1993); *see also United States v. Dennis*, 843 F.2d 652, 656 (2d Cir.1988) ("If counsel were to cross-examine the witness as to his conversations with him, argue the credibility of his testimony to the jury, or suggest alternative interpretations of his account of the conversation, counsel would place himself in the position of an unsworn witness and implicitly put his own credibility at issue.") (quoting *McKeon*, 738 F.2d at 35 (internal quotation marks omitted)). In this case, Defendant Odeh also asks the Court to disqualify AUSA Fitzgerald, and K.K. Mohamed seeks the same relief with respect to AUSA Karas, from participating as the Government's advocate at trial and in any relevant pre-trial proceedings on the ground that others will testify about events in which they were involved, making the AUSAs unsworn witnesses for the Government.

 It was suggested at oral argument that any unsworn witness problem in this case might be avoided if—through redaction of documents and explicit instructions to witnesses—the jury is not informed that Fitzgerald and Karas were present for the respective interviews. For example, a witness may claim that a "government attorney" was present for one of the interviews, but not identify that attorney. Similarly, Mr. Karas has affirmed that the Government does not intend to elicit at trial that

he was present for K.K. Mohamed's interview. (*See* Karas Affirmation at ¶ 6.) We believe that if measures such as those suggested are taken, any unsworn witness problem created by Fitzgerald's and Karas's participation in post-arrest interviews of Defendants can be resolved without causing the substantial prejudice to the Government that would follow if they were disqualified less than six months prior to trial, after working on the case for over four years. The Defendants' motions are, therefore, denied.

## VI. MOTION TO EXCLUDE UNITED STATES CITIZENS FROM SERVING ON THE JURY

Invoking an accused's Sixth Amendment right to an impartial jury, *see Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), Defendant El Hage asks the Court to exclude United States citizens from serving on the jury in this case, or at least to take appropriate action to ensure that the jury is not numerically dominated by American citizens.[36]

■■■ As a general matter, federal law attempts to ensure the impartiality of juries by selecting jurors randomly from a "fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C.A. § 1861 (West 2000); *see Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Moreover, it is well settled that equal protection principles forbid discriminatory exclusions from jury service on the basis of factors such as race and national origin. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); 28 U.S.C.A. § 1862 (West 2000).

■■■ In our view, Mr. El Hage's application runs counter to the foregoing fundamental principles. El Hage asks the Court to find that, as a matter of law, all United States citizens should be presumed to be biased against the Defendants. We believe, however, "that the exclusion from jury service of large groups of individuals not on the basis of their inability to serve as jurors, but on the basis of some immutable characteristic such as race, gender, or ethnic background undeniably gives rise to an 'appearance of unfairness,' " *Lockhart v. McCree*, 476 U.S. 162, 175, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), which offends both the Sixth Amendment and the Equal Protection Clause. *See Taylor*, 419 U.S. at 530–31, 95 S.Ct. 692.

We recognize, of course, that it does not offend one's "basic right[ ] of citizenship" to serve on a jury, *Lockhart*, 476 U.S. at 176, 106 S.Ct. 1758, to be disqualified for cause from serving "in a particular case." *Id.* (affirming the constitutionality of disqualifying *Witherspoon*-excludables from serving in a capital case). But we see no reason that this particular case warrants the exclusion of all United States citizens. Mr. El Hage's argument that exclusion is required because of a "complete consonance between the targets/victims and the potential jury pool" (El Hage's Memorandum of Law at 19) is not persuasive. When a conspiracy's targets are described at such a high level of generality (Americans), the notion that everyone who meets that description will be biased against the alleged conspirators is simply untenable. We see no reason, therefore, to alter the usual rules for selection of a venire panel that are applied in all criminal cases in this district.[37] Mr. El Hage's application is

---

**36.** Only United States citizens serve on juries in this Court. Granting Mr. El Hage's motion, therefore, would be tantamount to concluding that this Court is incapable of trying the conspiracy charges contained in the Indictment. Mr. El Hage seems to implicitly recognize this fact, since he suggests that the Court dismiss the conspiracy charges as an alternative form of relief from the jury bias he alleges. (El Hage's Memorandum of Law at 9.) Because we do not believe that any basis for relief exists on this claim, we decline to consider that request.

**37.** Which is to say, of course, that if, during jury selection, it becomes apparent that a particular prospective juror harbors an actual bias against any of the Defendants, an appro-

denied. The Court will address with counsel issues relating to the procedures to be followed concerning jury selection at the same time as it addresses any severance motions.

### CONCLUSION

For the foregoing reasons, all of the motions presently before the Court are denied. The Defendants may file additional motions when they become appropriate.

SO ORDERED.

priate application to have that juror stricken for cause will be entertained.